Filed 2/23/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S048337 |
| v. | ) | |
| | ) | |
| REGIS DEON THOMAS, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA075063 |
| _____ | ) | |

Defendant was convicted of the second degree murder of Carlos Adkins and the first degree murders of Compton Police Officer Kevin Burrell and Reserve Officer James MacDonald.  The jury found true special circumstance allegations that the officers were killed while engaged in the performance of their duties and that defendant was convicted of more than one murder.  (Pen. Code, § 190.2, subds. (a)(3) and (a)(7).)[1]  The jury found him guilty of one count of being a felon in possession of a firearm.  (§ 12021, subd. (a).)  Allegations as to all three murder counts that defendant personally used a firearm within the meaning of section 12022.5 also were found true.  Defendant also pleaded guilty to one count of being a felon in possession of a firearm (§ 12021, subd. (a)) and to one count of being in possession of a concealed firearm in a vehicle (§ 12025, subd. (a)(1)).  The jury set the penalty for the murders of the police officers at death, and the trial court denied defendant's motion for a new trial and the automatic motion to modify the

_____

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

death verdict.  The trial court imposed a death sentence on all three murder counts and a total of six years four months for the firearms enhancements on the three murder charges.  The trial court also imposed a term of three years on one of the weapons counts, and stayed sentence on the other two weapons counts.

This appeal is automatic.  (Cal. Const., art. VI, § 11(a); § 1239, subd. (b).)  For the reasons explained *post*, we modify the judgment to correct the sentence imposed on count 1 for second degree murder, and in all other respects we affirm defendant's convictions and death sentence.

## I. FACTS

### A.  Guilt Phase

#### 1.  Murder of Carlos Adkins

In January 1992, Carlos Adkins was shot to death in the apartment of Janice Chappell, located in the Nickerson Gardens housing project in Los Angeles.  Andre and Janice Chappell and their friend Bertrand Dickson witnessed the shooting.  Dickson, who was visiting Andre Chappell, went out to purchase some cigarettes.  When returning, he thought he heard someone call out his nickname.  Believing it to be his friend Romeo, he responded by calling out, "Romeo, down here."  Defendant, who was driving by, called out to him, "You don't know me, don't try to sell me something."  Dickson explained that he had not been talking to defendant.  As he was walking toward the Chappell's apartment, Dickson saw defendant pointing a gun at him from the window of the car.

Dickson went inside the apartment, where Adkins was playing chess with Andre Chappell.  He heard a banging at the door.  Chappell opened the door and defendant entered, making angry remarks.  Defendant had a gun at his side.  Dickson explained that he was calling to his friend Romeo and had not been trying to sell anything to defendant.  Carlos Adkins then stood up.  Defendant asked him

2

what he was going to do, stating "I know you's a Tillman," and hit Adkins with the gun. Adkins stated that he was not named Tillman and defendant told him to "shut up." Janice Chappell, who had been asleep upstairs, was awakened by the sounds of arguing and walked downstairs. She observed defendant, Adkins, Andre Chappell, and Dickson in the living room. Defendant appeared to be angry and Andre Chappell appeared to be trying to calm him down. Defendant started to leave the apartment and as he was walking to the door he apologized to Janice Chappell for the disturbance and stated that the men in the apartment "don't know who I am." Dickson thought he heard defendant identify himself as "Renzi." Adkins then stated to defendant, "You don't know who I am either." Defendant came back inside, placed the gun between Adkins's eyes and threatened to "blow [his] brains out." Adkins grabbed the gun and a struggle ensued, during which two shots were fired.

Dickson ran out of the apartment and called 911. When he went to meet the ambulance, he was stopped by defendant and another man. They told him not to say anything about the incident and pistol-whipped him. The two men forced Dickson into the trunk of their car at gun point, but Dickson got out and ran away. Adkins subsequently died of a gunshot wound to the right lower chest.

The next day Dickson informed his parole officer that he had witnessed a shooting, and was advised to contact the police. When he initially met with police detectives, he described the shooting and told the officers that the shooter's name was "Renzi." Subsequently, Dickson met with a local man named Renzi, who Dickson knew was not the killer. He informed the police that he had learned that the correct name was "Reggie." Dickson identified defendant's picture in a photographic display and later selected him during a live lineup. Janice Chappell also picked defendant's picture from a photographic display, indicating that he looked like the man who shot Carlos Adkins.

3

Several months later, defendant was identified during a traffic stop and arrested on a warrant for the shooting of Carlos Adkins. In September of 1992, Dickson, who was then incarcerated, was transported to the Compton courthouse for defendant's preliminary hearing. He was placed in a holding cell with defendant, who asked him why he was going to testify. Defendant stated that he had not meant to "do it" and that it had been his girlfriend's birthday and he had argued with her and was upset. He "just went off." Defendant told Dickson that Dickson "didn't want to end up like Andre [Chappell]." Dickson was aware that Andre had died. He understood defendant to be saying that if he testified, he could not go back to the projects. Defendant offered to give Dickson $5,000 if he "turned the cheek." Dickson told the prosecutor that he had identified the wrong man, and defendant was released.

Defendant was subsequently recharged with the murder of Adkins. At trial, Dickson identified defendant as the person who shot Adkins. Dickson had been promised that if he testified he would serve his sentence outside Los Angeles County if he were convicted on a pending burglary charge. Janice Chappell also testified that defendant looked like the person who shot Adkins, stating that she was 98 percent certain he was the man. Andre Chappell did not testify because he had been shot and killed in the Nickerson Gardens housing project in March 1992.

The jury found defendant guilty of the second degree murder of Carlos Adkins.

### 2. *Murders of Officers Burrell and MacDonald*

In March of 1992, defendant purchased a red 1992 Chevrolet 454 pickup truck. Late at night on February 22, 1993, Compton Police Officer Kevin Burrell and Reserve Officer James MacDonald made a traffic stop of a red pickup truck on Rosecrans Avenue in Compton. Margaretta Gully was driving past the scene,

4

accompanied by her 12-year-old son, De'Moryea Polidore, in the front seat, and her 11-year-old daughter and her older son's girlfriend, Alicia Jordon, in the backseat. Through the windshield of her car, Gully observed two officers, one Black and one White, struggling with a suspect. A red pickup truck was parked nearby with the door on the driver's side open. Just after Gully passed the scene, she heard shots fired. Through her rearview mirror, she saw the suspect straddling one of the officers, who was lying on the ground. Her son Polidore heard shots and looked through the back window, observing the suspect shoot the White officer in the head. Polidore then observed the suspect get into the truck and drive away. As the truck passed their car, passenger Jordon saw the driver's face through the side window of the car. At trial, Gully, Polidore, and Jordon testified that defendant had all of the same features and the same body type as the suspect they observed.

Both officers were found lying facedown near the police vehicle. Both officers were in uniform with their guns holstered. There were nine spent nine-millimeter shell casings in front of the police vehicle. Officer Burrell died of multiple gunshot wounds — one to the arm, one in the face, one in the left foot, and one in the head. Officer MacDonald was also shot four times, in the left armpit, the middle back, the upper back, and behind the right ear, and died of a wound to the chest.

Defendant's wife, Deshaunna Cody Thomas, testified that on the evening of the day the officers were killed, defendant left her apartment in his red pickup truck, stating that he was going to his mother's house in Nickerson Gardens. When she woke up the next morning, defendant was in bed with her and he had a gun in his hand.

Defendant's friend, Keyon Pie, testified that sometime in February of 1993, defendant arrived at her house and asked her to hold a gun for him. He gave her a

5

gun wrapped in a bag and she placed it under her mattress. The next day, a man she had never seen before came and picked up the gun.

That man, Calvin Cooksey, testified that on February 24 or 25, he was at the apartment of his cousin, Philip Cathcart, in Gardena. Defendant, who was a very close friend of Cooksey's cousin, arrived at the apartment. Cooksey was watching a news broadcast relating to the shootings of the two officers. Cooksey looked at defendant, who appeared to be "jittery," and defendant said, "Yeah, I did it. . . . They slipped." Cooksey understood that "slipped" meant that the officers failed to take precautions. Defendant told Cooksey that when Officer Burrell approached the truck, defendant kicked the door open and shot him in the chest. He then shot Officer MacDonald in the face while he was still in the police car. He then shot each of the officers three more times. Cooksey told defendant he did not believe him, but shortly thereafter he asked defendant where the gun was and offered to dispose of it.

Defendant showed Cooksey a house and told Cooksey to return there later to obtain the gun. When Cooksey returned, the woman in the house gave him a bag, which contained a SIG SAUER nine-millimeter pistol. He sold the gun to Robert Rojas.

In early March 1993, defendant was questioned in connection with the shooting of the officers, but was released. He told Cooksey, "They think I did it, but they can't prove it. Somebody is going to have to tell on me in order for them to bust me on this." In mid-March 1993, Cooksey was arrested while in possession of a firearm. A few days later, Cooksey called a sheriff's deputy with whom he was familiar as a result of a prior arrest, and told him that he knew who had killed the officers and that he knew the location of the gun used in the shooting. Cooksey told the deputy that the name of the killer was "Reggie" or "Regis Thomas." He described the sale of the gun. In a subsequent discussion

6

with another deputy, Cooksey asked for help with his pending charges and told the deputy about the sale of the gun and about the conversation in which defendant admitted to shooting the officers.

Shortly thereafter, Cooksey was released from county jail and, accompanied by a detective, located Rojas. Cooksey told Rojas he wanted to buy back the gun. Rojas contacted Cooksey the next day and informed him that he could get the gun. Cooksey met Rojas, paid for the gun, and gave it to the detective. Ballistics evidence indicated that the cartridge casings found at the scene of the shootings of the officers were fired from this gun.

The jury found defendant guilty of the first degree murders of Police Officers Kevin Burrell and James MacDonald, and found true the special circumstance allegations of multiple murder and murder of a police officer.

## B. Penalty Phase

### 1. Prosecution Case in Aggravation

In aggravation, the prosecution presented court records establishing that defendant had pleaded guilty to being a felon in possession of a firearm and carrying a loaded firearm in a vehicle (charges that were part of the present case). The prosecution presented testimony about an incident in 1990, when police officers stopped defendant while he was driving a van. Defendant pulled into a parking lot and jumped out, yelling and waving his arms. When an officer instructed defendant to put his hands behind his back, he did not comply but instead began to run. Another officer observed defendant reach into his waistband and throw an object. That officer ordered him to lie on the ground and he complied, but when the officer began to handcuff defendant he resisted and fought. He struggled with the two officers, rolling on the ground, kicking, and hitting them. One officer was struck in the eye and the other one on the lip. A

7

loaded handgun was found in a flower bed in the area where defendant had been when he threw the object.

Carlos Adkins's mother and daughter testified about Adkins and how his death had changed their lives. His mother testified that he was a good father to his four children and was attending college and studying architecture. Subsequent to his death, she no longer went out and had been hospitalized for a nervous breakdown. She still thought about him every day. When asked what she would say if she could tell him one more thing, she testified that she would say that she missed him. Adkins's daughter testified that the family was close and that her father had cooked breakfast every morning and come home every night. The night that he was killed was his birthday; his family had prepared dinner and a cake for him but he had not appeared. When she was told that he had died, she fainted. Since that time, she had felt nervous and lonely.

The parents of Officers MacDonald and Burrell testified concerning their sons and how the murders had affected their lives. James MacDonald had always wanted to be a police officer. He was working his last shift as a reserve officer in Compton on the night he was shot. He had previously accepted a position with the San Jose Police Department, which was closer to his parents' home in Santa Rosa. MacDonald's parents initially heard that their son had been shot and was in surgery, and when they called the Compton Police Department they were told he was still alive. Shortly thereafter, however, two Santa Rosa police officers arrived at the house and told them that their son was dead. Services were held for him in both Santa Rosa and Compton. MacDonald's father testified that he went to the cemetery every morning, and that he felt sick anytime he saw a police car making a traffic stop. If he could talk to his son one more time, he would ask to trade places with him. MacDonald's mother testified that she went to the cemetery twice a day, and she felt that her son had taken a piece of her heart with him. If

8

she could speak to him one more time, she would tell him that she missed him, was proud of him, and loved him.

Kevin Burrell had been close to his family and had visited them almost every day. He and his roommate had eaten dinner with his parents on the day he was killed. His parents did not live far from the location of the shooting and his mother heard the gunshots. A police officer came to the house and notified them that their son had been shot, but by the time they got to the hospital, he was dead. Burrell's father testified that the pain of his son's death had not diminished. If he could talk to his son again, he would tell him to remain ready and not to take chances. Burrell's mother testified that she and her son had been very close and did many things together. After his death, she suffered anxiety attacks and sometimes could not leave the house; she cannot visit her son's grave. If she could talk to her son again, she would tell him that she was proud of him, she loved him, and she missed him.

### 2. *Defense Case in Mitigation*

Defendant's friends and family members testified about his background and character and about their relationships with him. Growing up, defendant never knew his father. He lived with his mother, two sisters, and two brothers. When defendant was 10 years old, his mother's boyfriend, Willie Riley, moved into the house and acted as a father figure to defendant. However, after two years, he moved out, partly because of defendant's mother's drug addiction. Defendant's mother had been addicted to cocaine since 1976. As a result, she lost her house. At one time, she left home for a week. Defendant was upset about his mother's drug use and he asked her to stop. He would get upset when people were using drugs at the house. In the housing project where they lived, people picked on defendant and bullied him because he was short.

9

Defendant's wife, Deshauna Cody Thomas, testified that he had been a good husband to her and a good father to their six children. Their children asked about him frequently, and she needed his assistance in raising them. Kawasci Jackson, defendant's former girlfriend and the mother of his son, testified that defendant never abused her and that he helped her by disciplining their son when they spoke by telephone; her son loved his father. A neighbor who worked as a teacher had observed defendant's interaction with his son and had observed his son when defendant talked to his son on the telephone following his incarceration. She believed that defendant was a nice person. Defendant's aunt testified that he had helped a neighbor who was caring for her grandchildren by playing with the children and buying them ice cream. He also had helped a cousin who was suffering from cancer by picking up her medication and other things she needed. Defendant's mother asked the jury not to kill her son stating, "If you take my son, you might as well take me too."

## II. DISCUSSION

### A. Jury Selection Issues

#### 1. *Use of Juror Numbers*

Defendant contends the trial court erred in ordering, over defendant's objection, that the prospective jurors and trial jurors be referred to by number only. He contends that no exceptional circumstances justified use of a numbered jury, and that the use of jury numbers violated his rights to be presumed innocent, to a fair and public trial, to a reliable guilt and penalty verdict, and to be free from cruel and unusual punishment, requiring reversal of his convictions and death sentence. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art I, §§ 1, 7, 15, 16, & 17.)

The prosecutor supported his request to refer to prospective jurors by number rather than name by informing the court that someone had telephoned a prosecution witness, Margaretta Gully, and offered her a bribe not to testify, and that there had been two written threats to unspecified witnesses. Defense counsel countered that the bribe was not a threat and did not amount to good cause to conduct the trial with a numbered jury, and that in any event these incidents had nothing to do with defendant. Defense counsel also argued that the use of numbers would increase the jurors' fears. The trial court ruled that numbers would be used for all prospective jurors but that counsel would have access to their names. In addition, the court informed the jurors that they were being given numbers to protect their privacy because of media interest in the trial.

As defendant acknowledges, *People v. Goodwin* (1997) 59 Cal.App.4th 1084 held that a procedure similar to the one used here was proper, even without a showing of a particular need to protect jurors' identities. In *Goodwin*, the Los Angeles County Superior Court had adopted a policy to refer to all potential and actual jurors by number in all criminal trials, in order to implement the requirement of Code of Civil Procedure section 237, subdivision (a)(2) that the names of jurors not appear in the transcript of a criminal case. (*Goodwin*, *supra*, at p. 1089.) As in the present case, the court and counsel had access to the jurors' names. (*Ibid*.) The appellate court held that the procedure did not violate the defendant's right to a public trial because the trial was open and the jurors' faces were visible to anyone present. (*Id*. at p. 1093.) In addition, any risk that the jury would speculate that the use of numbers related to the defendant's dangerousness was diminished because the trial court indicated it would admonish the jury that the procedure was required in all criminal cases and had nothing to do with the defendant. (*Id*. at p. 1091, fn. 3.)

Defendant contends that *Goodwin* is inconsistent with federal law, which he argues requires extraordinary circumstances to justify an anonymous jury. We need not decide whether *Goodwin* was correctly decided because the procedure employed in the present case was proper even under the federal authorities upon which defendant relies. The federal cases hold that a trial court's "decision to empanel an anonymous jury is entitled to deference and is subject to abuse of discretion review." (*United States v. Krout* (5th Cir. 1995) 66 F.3d 1420, 1426; accord, *United States v. Ross* (11th Cir. 1994) 33 F.3d 1507, 1519.) Federal courts recognize two potential problems with an anonymous jury: (1) jurors may infer that the defendant is dangerous, thereby implicating the defendant's right to a presumption of innocence, and (2) the use of an anonymous jury may interfere with the defendant's ability to conduct voir dire and exercise peremptory challenges. (*United States v. Shryock* (9th Cir. 2003) 342 F.3d 948, 971.) Consequently, federal cases permit an anonymous jury "where (1) there are strong grounds for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused." (*United States v. DeLuca* (1st Cir. 1998) 137 F.3d 24, 31; accord, *United States v. Shryock*, *supra*, at p. 971; *United States v. Ross, supra*, at pp. 1519-1520.)

We find no abuse of discretion in the trial court's decision to order that the jurors be identified by numbers. The prosecutor informed the court that two witnesses had been threatened and one had been offered a bribe. These incidents provided reasonable grounds for concern that an attempt might be made to unlawfully interfere with the jurors' performance of their duties. Any interference with defendant's right to conduct voir dire was minimized because the jurors were not completely anonymous — counsel had access to the names of the jurors.

Defendant contends that the procedure interfered with his ability to assist his counsel in jury selection because he was not personally allowed access to the jurors' names. Defendant argues that he might not have recognized a juror's face but might have recognized a name and realized he knew something about the juror or the juror's family that might cause the juror to be biased. Defendant's contention is speculative and in any event any minor interference with the conduct of voir dire that may have occurred was justified by the court's legitimate concerns for the safety and integrity of the jury.

As to the presumption of innocence, federal cases have recognized that "the danger that the jury might infer that the need for anonymity was attributable to the defendant's character is minimized when the trial court gives the jurors a plausible and nonprejudicial reason for hiding their identities." (*United States v. Ross, supra*, 33 F.3d at p. 1520 [court explained it wanted to insulate the jury from contact from either side and that its decision did not reflect on the defense]; *United States v. Shryock*, *supra*, 342 F.3d at p. 972 [trial court instructed the jury that the "reason for their anonymity was to protect their privacy from curiosity-seekers"]; *United States v. Thomas* (2d Cir. 1985) 757 F.2d 1359, 1365 [trial court's explanation that anonymity was to deter unwanted press attention minimized potential for prejudice to the defendants].) Here, the court's explanation that numbers were being used to protect the jurors' privacy in light of media interest in the case served to minimize the possibility of prejudice to defendant.

*2. Denial of Individual Sequestered Death Qualification Voir Dire*

Defendant contends the trial court erred in refusing his request that the court conduct individualized, sequestered voir dire of the jurors regarding their views on the death penalty, in accordance with *Hovey v. Superior Court* (1980) 28 Cal.3d 1. *Hovey* was abrogated by the adoption of Code of Civil Procedure

13

section 223, which provides that "[v]oir dire . . . shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." Defendant urges us to reconsider our conclusions that *Hovey* was abrogated by statute and that individualized sequestered voir dire is not constitutionally required — conclusions we have reaffirmed many times — but he provides no compelling reason for us to do so. (See, e.g., *People v. Lewis* (2008) 43 Cal.4th 415, 494; *People v. Stitely* (2005) 35 Cal.4th 514, 537-538 (*Stitely*); *People v. Box* (2000) 23 Cal.4th 1153, 1180; *People v. Waidla* (2000) 22 Cal.4th 690, 713.)

Defendant alternatively contends the trial court abused its discretion in denying the motion for sequestered voir dire. Under Code of Civil Procedure section 223, the trial court retains the discretion to conduct sequestered voir dire if it concludes that collective voir dire would not be practicable. (See *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168.) At trial, both defense counsel and the prosecutor requested sequestered voir dire, because both believed that if jurors were questioned individually they were more likely to be candid and less likely to be influenced by responses they heard from other jurors. Neither party, however, cited any particular circumstances of the present case that would justify conducting individual voir dire. Each juror filled out an extensive questionnaire, and was instructed to mark any question addressing sensitive or confidential matters to which he or she wished to respond in private. After the court questioned the jurors who were seated in the jury box, the attorneys were given the opportunity to inquire further. Under similar circumstances, we have held that the

14

trial court did not abuse its discretion in denying individual sequestered voir dire. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1050-1051.)[2]

### 3. *Excusal for Cause of Two Prospective Jurors*

Defendant contends the trial court erred under *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*) in granting the prosecution's challenge for cause of two prospective jurors based on their inability to impose the death penalty. He contends the error violated his rights to an impartial jury, a fair capital sentencing hearing, and due process of law under the federal and state Constitutions.

A prospective juror in a capital case may be excused for cause on the basis of his or her views regarding the death penalty only if those views would prevent or substantially impair the performance of the juror's duties. (*Witt*, *supra*, 469

---

[2] Defendant contends that the collective voir dire adversely influenced jurors' ability to be candid, but he cites only one example of a juror who allegedly was not honest about his views concerning the death penalty. On his questionnaire, this prospective juror clearly agreed with the proposition that anyone who intentionally kills another person should always receive the death penalty. During collective voir dire, he reaffirmed this answer to defense counsel and added that he would vote for death "99 out of a hundred." In response to leading questions by the prosecutor during collective voir dire, he indicated that he could vote for a sentence of life imprisonment without parole. Because this juror gave what defense counsel believed were inconsistent or even dishonest answers about his views concerning the death penalty, the court questioned him further at a sidebar conference. Outside the hearing of other jurors, he explained to the court that there might be one chance in a thousand that he would vote for life, and that he could think of circumstances that might convince him that life imprisonment was appropriate, such as if the person were under the influence of drugs. Nothing in this record supports defendant's contention that collective voir dire caused this prospective juror to be less than candid about his views. Even if it did, counsel had the opportunity to thoroughly examine him concerning his views and the court conducted additional voir dire individually. "As in other recent cases, defendant has not shown on this record that ' "questioning prospective jurors in the presence of other jurors prevented him from uncovering juror bias." ' [Citations]." (*People v. Brasure*, *supra*, 42 Cal.4th at p. 1053.)

U.S. at p. 424; *People v. Stewart* (2004) 33 Cal.4th 425, 441; *People v. Cunningham* (2001) 25 Cal.4th 926, 975.)  We will uphold the trial court's decision to excuse a prospective juror under *Witt* if that decision is fairly supported by the record.  (*Stewart*, *supra*, at p. 441; *People v. Cunningham*, *supra*, at p. 975.)  The court must have "sufficient information . . . to permit a reliable determination" whether a prospective juror's views would disqualify the juror from service in a capital case.  (*Stewart*, *supra*, at p. 445.)  Even if the prospective juror has not expressed his or her views with absolute clarity, the juror may be excused if "the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law."  (*Witt*, *supra*, at p. 425.)  If, after reasonable examination, the prospective juror has given conflicting or equivocal answers, and the trial court has had the opportunity to observe the juror's demeanor, we accept the court's determination of the juror's state of mind.  (*People v. DePriest* (2007) 42 Cal.4th 1, 20-21; *People v. Moon* (2005) 37 Cal.4th 1, 14, 16.)[3]

_____

[3]     As a threshold matter, defendant takes issue with the standards we have applied to such issues and contends that we have erred in deferring to the trial court's determination when a prospective juror gives conflicting or equivocal answers.  He contends that the United States Supreme Court rejected such deference to the trial court in *Adams v. Texas* (1980) 448 U.S. 38 and *Gray v. Mississippi* (1987) 481 U.S. 648.  We have previously rejected this contention.  (*People v. Schmeck* (2005) 37 Cal.4th 240, 262-263; *People v. Moon*, *supra*, 37 Cal.4th at pp. 14-15.)  Furthermore, the high court has more recently reiterated its view that "[c]ourts reviewing claims of *Witherspoon-Witt* error . . . owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror."  (*Uttecht v. Brown* (2007) 551 U.S. 1, 22.)

*a. Randy J.*

Defendant contends that Prospective Juror Randy J. was erroneously excused because his views on the death penalty would not prevent him from following the law. Defendant points to the circumstances that Randy J. stated he could follow the law if he felt the death penalty were appropriate and that he could impose the death penalty if a person murdered 50 people.

Even if a prospective juror expresses a willingness to follow the law, he or she may be excused under *Witt* if other responses "furnished substantial evidence of [his or] her inability to conscientiously consider a death verdict." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1114-1115 [upholding dismissal of juror even though some of her responses reflected a willingness to follow the law and the court's instructions].) Randy J.'s responses to voir dire, taken as a whole, clearly support the trial court's conclusion that his views concerning the death penalty "would prohibit him from doing his job properly." Asked whether he could see himself choosing the death penalty in an appropriate case, he stated "I cannot choose the death penalty. . . . Because it's something I have to live with . . . ." He stated that he would follow the law and the court's instructions, but when asked whether he could impose death he responded, "I would say not." Asked whether he could impose the death penalty if he thought the facts warranted it, he said, "No," explaining, "Because it's a tough decision." Asked whether there was a circumstance in which he could make that decision, he replied, "Probably if [the defendant] murdered 50 people." Randy J. indicated that he could "probably" follow the court's instructions and when asked whether he could impose the death penalty if he felt it was appropriate he responded, "If I felt that way." When asked whether the death penalty goes against his moral or religious beliefs, however, he responded, "It goes against everything I stand for. I can't live with myself putting [a] death sentence on somebody and living with that." When asked finally

17

whether he could see himself coming in after the deliberations and stating in open court that the defendant should die he stated, "I don't think I'm the man for it."

That the prospective juror might possibly have been able to overcome his views in a case involving 50 victims does not establish that he could conscientiously consider the death penalty in a case like the present one. (See *People v. Roybal* (1998) 19 Cal.4th 481, 519 [upholding dismissal of juror in a case involving a single victim, even though juror might have been able to impose a death sentence in a case involving multiple victims].) The trial court did not err in concluding that Randy J.'s views on the death penalty would substantially impair his ability to perform the duties of a juror.

### b. Milton T.

Defendant also challenges the excusal of Prospective Juror Milton T. On his questionnaire, Milton T. indicated that he could impose the death penalty or life without possibility of parole in an appropriate case. But he also stated, "If there are people strong willed enough to give the other person the death penalty, that's that. I'm not sure that I can handle it. . . . I just don't know if I could mentally or morally handle sentencing another person to [death]." Milton T. indicated that he was in favor of the death penalty if a child were intentionally killed and did not indicate that he would always vote for life; he agreed that he could follow the law. He also wrote that, because of his moral and religious views, he was reluctant to judge others, but that he could set aside his personal feelings and follow the law. In response to a question concerning whether there was any reason he would prefer not to serve he wrote, "I don't like deciding a case of such a serious moral matter."

When the court questioned Milton T. about these responses he stated, "The situation with my duty as a juror, I guess I would have to go beyond the way I feel

18

and make the decision." He stated, however, that based on what he knew of the circumstances of this case, "it would be really hard for me to come up with something like that." He agreed that if the jury reached the penalty phase, he was capable of following the law and weighing whatever was presented. But in response to questioning by the prosecutor, he stated he was "very uncomfortable" with the prospect of deciding whether to impose capital punishment. Asked whether he would have difficulty making the decision to return a verdict of death he stated, "It's my job to do so, so I would. But my own personal self, I would have to deal with it after I leave from here." Asked to clarify whether he could vote that the defendant is to die he replied, "I can't say if I can answer that truthfully or not because I haven't been through it . . . . I'm not sure if I could be able to go through with it. I don't know if I would be able to come up with that verdict or not." The prosecutor asked, "Is it your opinion then that regardless of the evidence . . . is it your state of mind now that you don't know if you could, in fact, come in with a verdict that the defendant is to die." He responded, "Right."

The court granted the prosecutor's challenge for cause, explaining, "I think emotionally, truly from his demeanor and even while you two are asking questions of other jurors, I watched him and I watched his body language, and I think that his personal views would substantially impair him from performing his duties as a juror . . . and I think that the man is trying. But I don't think that he can do the job under the standard."

Milton T.'s answers demonstrate that he was not opposed to the death penalty in theory, but that he was extremely reluctant to make the decision whether someone should be executed. Although he expressed a willingness to follow the law, when asked whether he could actually impose the death sentence, he indicated that he did not know whether he could, regardless of what the evidence might be. His equivocal answers, combined with the trial court's

19

observations of his demeanor, convinced the trial court that his ability to perform the duties of a juror in a capital case would be substantially impaired by his reluctance to be personally responsible for sentencing someone to death. Giving appropriate deference to the trial court's determination of the prospective juror's state of mind based on its firsthand observations, we find no error. (See *People v. Solomon* (2010) 49 Cal.4th 792, 836 [trial court did not err in excusing juror who, although not opposed to the death penalty in theory, "was unable to state that she could set aside her reluctance to be personally responsible for sentencing someone to death and vote for the death penalty in an appropriate case"]; *People v. Cunningham*, *supra*, 25 Cal.4th at p. 981 [trial court did not err in excusing "prospective juror on the basis that she could not personally impose the death penalty despite viewing it as an appropriate punishment"].)

### 4. Prosecutor's Use of Peremptory Challenges to Strike African-American Prospective Jurors

Defendant contends the trial court erred in denying his motion for a mistrial claiming that the prosecutor's use of peremptory challenges was based on race, in violation of *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*). At the time defendant made the motion, the prosecutor had used peremptory challenges against six African-American prospective jurors. Defense counsel stated that none of the African-Americans except one, Leticeia H., had expressed any reservation about the death penalty. The trial court ruled that defendant had not established a prima facie case of racial discrimination and that, consequently, the prosecutor was not required to provide an explanation for why he had challenged these jurors.

A prima facie case of racial discrimination in the use of peremptory challenges is established if the totality of the relevant facts gives " 'rise to an inference of discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S.

20

162, 168.) *Johnson* reversed a prior decision of this court holding that the applicable standard was whether it was "more likely than not" that purposeful discrimination had occurred. (See *People v. Johnson* (2003) 30 Cal.4th 1302, 1318.) In cases like the present one, in which it is not clear whether the trial court applied the proper standard, "we independently determine whether the record permits an inference that the prosecutor excused jurors on prohibited discriminatory grounds." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1293 (*Carasi*).) In doing so, we must consider "all relevant circumstances." (*Batson, supra*, 476 U.S. at p. 96.)

Defendant cites the following as supporting an inference that the prosecutor exercised six peremptory challenges on the basis of race: The case involved an interracial offense (defendant is African-American, and one of his victims, Officer MacDonald, was Caucasian); two of the African-American jurors challenged by the prosecutor gave answers that appeared to strongly favor the prosecution (Alyn C. stated that she favored the death penalty for repeat offenders and Jacqueline R. had a friend in the Compton Police Department); and the excluded jurors had little more than their group membership in common and were otherwise a diverse group of individuals that would have made acceptable jurors. (See *Wheeler, supra,* 22 Cal.3d at p. 280; *People v. Turner* (1986) 42 Cal.3d 711, 719).

These circumstances do not raise an inference that the prosecutor exercised peremptory challenges based on race. Although one of the victims was Caucasian, the other two victims were African-American. Contrary to defendant's contention, the answers given by Prospective Jurors Jacqueline R. and Alyn C. were not so obviously favorable to the prosecution that it can be inferred that the prosecutor's excusal of these two must have been based on race. Although Jacqueline R. had a friend in the police department and could have been viewed as a juror who would be sympathetic to the victims, she had mixed feelings about the death penalty and

21

at one time did not believe in it at all. In addition, her son was in prison for armed robbery, and she stated that she believed he was not treated fairly because the prosecutor in that case was trying to make an example of him. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 70 [excused juror's voir dire disclosed numerous reasons for a prosecutor to excuse her, including personal experience with an allegedly unfair homicide prosecution of a close relative].) Although no obvious reason appears why the prosecutor would have chosen to strike Alyn C., neither were her answers so favorable to the prosecution that it would be reasonable to infer, solely on that basis, that she was excused because of her race.[4]

Even if the struck African-American jurors had nothing in common with each other besides their race, that circumstance does not, in itself, create an inference that they were excused because of their race where, as here, obvious bases for the prosecutor's decision to excuse many of the jurors appear in the

---

[4] Alyn C. was divorced and the mother of two children. She worked at the Department of Motor Vehicles. She had a cousin who worked for the Los Angeles Police Department as a dispatcher, and she had no negative experiences with the police. She indicated she would be reluctant to serve as a juror if graphic photographs of a victim might be in evidence. She believed it was fair to require the prosecution to prove defendant's guilt beyond a reasonable doubt. Although she once felt differently, she now believed in the death penalty for repeat offenders. She would not use the death penalty if the killing was not premeditated or was committed in self-defense. During voir dire, the prosecutor questioned her on two points. He asked about the response on her questionnaire indicating that her religious views might make it difficult for her to judge another person. She clarified that she should have answered "no" to that question. The prosecutor also questioned her about her statement on the questionnaire that she believed it was possible for a witness to lie in order to cover something up or make something appear worse than it actually was. She could not remember any example of what she had in mind when she wrote that answer, and explained that she filled out the questionnaire at midnight and she was helping her two children with their homework at the time.

22

record. As noted above, Jacqueline R. had doubts about the death penalty and believed that her son had been prosecuted unfairly. Diana T. wrote on her questionnaire that she did not believe in the death penalty and that she would always vote for life and reject death, regardless of the evidence presented at the penalty trial. Leticeia H. indicated on her questionnaire that, based on her personal and religious beliefs, she did not believe that a criminal should be put to death and that she would always vote for life. It is not apparent exactly why the prosecutor would have wanted to excuse Jeanine P., but the record demonstrates that the trial court observed something about her that caused it to believe that she would be perceived as a problem by the prosecution.[5]

Although no obvious reason appears why the prosecutor would have chosen to strike Alyn C. or Patricia S., the absence of a reason that is apparent on the record does not, in the context of all the other circumstances, suggest that the reason was race. Here, "the prosecution's pattern of excusals and acceptances during the peremptory challenge process reveals no obvious discrimination" against African-American jurors. (*Carasi, supra,* 44 Cal.4th at p. 1294.) The trial court observed that the first time the prosecution accepted the panel, it appeared to the court that there were two African-American males and two African-American females on the panel. The court noted that the prosecution subsequently accepted the panel with three African-Americans and that, at the time the motion was made,

---

**5**      Jeanine P. stated she was willing to impose the death penalty, although she had not really thought about it before and was not sure that it was "helpful." After the prosecutor challenged two other jurors for cause, the court asked, "You're not even going to challenge Ms. [P.]?" Subsequently, the prosecutor stated that he "got bad vibes" from her and wanted time to review her answers on the questionnaire. After a short break, he exercised a peremptory challenge against her.

the panel included two African-American females and one female who was half African-American.**6** At the time of defendant's *Wheeler* motion, African-Americans constituted 26 percent of the prospective jurors who had been called into the jury box (15 out of 61) and the prosecutor had exercised 37 percent of his challenges (6 out of 16) against African-Americans. This disparity is not significant enough, in itself, to suggest discrimination. (See *Carasi*, *supra*, at pp. 1291, 1295 [no prima facie case of gender discrimination even though prosecutor used 20 out of 23 peremptory challenges against female prospective jurors]; *People v. Bonilla* (2007) 41 Cal.4th 313, 345 [no prima facie case of gender discrimination even though women represented 38 percent of the jury pool and the prosecutor used 67 percent of his strikes against women].) We conclude that the totality of facts did not give rise to an inference of discrimination.

### 5. *Alleged Prosecutorial Misconduct During Voir Dire*

Defendant contends the prosecutor committed prejudicial misconduct during voir dire by explaining the presumption of innocence to prospective jurors in a manner that undermined that concept, thereby violating his rights to due process of law, proof beyond a reasonable doubt, the presumption of innocence, a fair jury trial, and a reliable and nonarbitrary penalty determination, as guaranteed by the state and federal Constitutions. The prosecutor described a hypothetical situation in which the prospective juror is in a cashier line in a grocery store and personally observes a person rob and murder the cashier. The prosecutor commented, "That person, if that person could be caught, would be prosecuted for

---

**6** Respondent states, without contradiction, that at the end of jury selection, the jury and alternates included eight African-Americans, one Afro Cuban, one half African-American, one French Creole, one Egyptian, two Hispanics, and four Caucasians.

murder. But that person would be presumed innocent, even though you saw it happen right before your eyes. The law places this legal presumption that that person is presumed innocent until one of two things happens. One, the person comes into the courtroom and says, 'I'm guilty,' or, two, 12 jurors decide that he's guilty. And until and unless that occurs, that person is presumed innocent and it wouldn't matter if just you by yourself witnessed it or if there were 40 people in the line and 40 people observed it. The trial court overruled defendant's objection to these statements, but explained to the prospective jurors that they would not serve as jurors in a case if they had witnessed the crime.

"In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury." (*People v. Price* (1991) 1 Cal.4th 324, 447.) "When, as here, the point focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.) We find no misconduct. Defendant argues that the prosecutor's comments "diluted the presumption of innocence by suggesting to the jury that it did not need to put aside any bias [the jurors] might have against [defendant] due to the fact that he stood in front of them indicted and accused by the prosecution of a crime because there was a significant possibility that he was actually guilty, just like the murderer of the cashier in the prosecution's example." We disagree. Although one of the conclusions a juror might have drawn from the prosecutor's example was that the presumption of innocence does not mean that the defendant actually is innocent, the main point of his example was that the presumption of innocence applies in court once the person has been charged with a crime, regardless of the circumstances. In other words, jurors must set aside any biases they might have against the defendant, presume him to be innocent, and convict him only if his

25

guilt has been proved in court beyond a reasonable doubt.  The prosecutor's statements "were not legally erroneous, and defendant had ample opportunity to correct, clarify, or amplify the prosecutor's remarks through his own voir dire questions and comments."  (*People v. Medina* (1995) 11 Cal.4th 694, 741.)[7]

"Moreover, as a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case.  Any such errors or misconduct 'prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings . . . .' "  (*People v. Medina, supra,* 11 Cal.4th at p. 741.)

## B.  Guilt Phase Issues

### 1.  Trial Court's Refusal to Sever the Carlos Adkins Murder Charge

Defendant contends the trial court's denial of his motion to sever the murder charge of Carlos Adkins from the murder charges of the two police officers was error and denied him a fair trial.  In the trial court, defendant argued that evidence regarding the shooting of the police officers was likely to inflame the jury so much that he could not receive a fair trial on the Adkins homicide.  Additionally, defense counsel indicated there was a possibility that defendant might testify regarding self-defense or imperfect self-defense in the trial of the Adkins homicide, but would not testify in connection with the police officer counts.  The trial court denied the motion.

Defendant concedes that joinder of the three murder charges was proper under section 954, which permits joinder of "two or more different offenses of the

---

[7]    We found no misconduct in a case in which a prosecutor made a comparable comment during voir dire, stating that "even Jack Ruby (whose killing of Lee Harvey Oswald was broadcast on national television) had the right to a jury trial."  (*People v. Seaton* (2001) 26 Cal.4th 598, 636.)

26

same class of crimes or offenses." (*Ibid.*; see *People v. Soper* (2009) 45 Cal.4th 759, 771 (*Soper*).)  This requirement was clearly met in the present case because all three counts alleged murder.  Even when the requirements for joinder are satisfied, however, the court "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ." (§ 954.)  On appeal, defendant must show that the trial court's ruling was an abuse of discretion.  (*Soper, supra,* at p. 774.)  In order to establish an abuse of discretion, defendant must make a "clear showing of prejudice." (*People v. Mendoza* (2000) 24 Cal.4th 130, 160.)

"In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.' " (*Soper, supra,* 45 Cal.4th at p. 774, quoting *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.)  We consider first whether the evidence of the two sets of offenses would have been cross-admissible if the offenses had been separately tried.  (*Soper*, *supra*, at pp. 774-775.)  If the evidence would have been cross-admissible, then joinder of the charges was not prejudicial.  Defendant contends that the evidence would not have been cross-admissible in separate trials, and we agree.  The two sets of crimes were entirely unrelated and the only similarity between them is that a nine-millimeter handgun (but not the same gun) was used in each incident.  Respondent does not argue to the contrary.

However, this does not end our inquiry.  Because the evidence would not have been cross-admissible, we next inquire "whether the benefits of joinder were sufficiently substantial to outweigh the possible 'spill-over' effect of the 'other-crimes' evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses." (*People v. Bean* (1988) 46 Cal.3d 919, 938; accord, *Soper*, *supra*, 45 Cal.4th at p. 775; see § 954.1 [lack of cross-admissibility does

27

not require severance].)  We consider "[1] whether some of the charges are likely to unusually inflame the jury against the defendant; [2] whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and [3] whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case."  (*People v. Mendoza*, *supra*, 24 Cal.4th at p. 161.)  "We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state."  (*Soper, supra,* at p. 775.)

The trial court did not abuse its discretion in refusing to sever the Adkins case.  As to the first consideration, there may have been a potential to inflame the jury because of the evidence of the murders of Officers Burrell and MacDonald. The victims were police officers and the killings were particularly callous — both officers were taken by surprise during a traffic stop and shot at close range multiple times after they had fallen.  However, defendant's shooting of Adkins was also callous; it arose from defendant's brief and unwelcome entry into a residence — defendant was inexplicably hostile, armed with a gun and threatening the occupants.  Adkins was killed after a struggle that was preceded by defendant putting a gun to Adkins's head, and threatening to blow his brains out.  Under these circumstances, we cannot say that the charges of the police officer shootings were particularly likely to inflame the jury against defendant.

Second, this is not a case in which a weak case has been joined with a stronger case.  In support of the motion to sever in the trial court, defendant contended that the evidence supporting the Adkins case was relatively weak, because Dickson had refused to testify at the preliminary hearing and Janice Chappell had not positively identified defendant.   He argued that, by contrast, the evidence as to the murders of the two officers was strong and was also highly inflammatory.  The prosecution fully expected Dickson to testify at trial, however,

28

and expected that he would not only identify defendant, but that he also would describe defendant's attempts to dissuade him from testifying. Thus, based on the record before the trial court at the time of the motion, it appeared that the evidence in both cases was strong. Even if the evidence in one case might be considered stronger than the other, "[a] mere imbalance in the evidence . . . will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper, supra*, 45 Cal.4th at p. 781.)

Third, although joinder did not convert the matter into a capital case, the charges of murdering the two officers were capital offenses and joinder resulted in the Adkins homicide being charged as a capital offense. Our concern in such situations is whether joinder "would tend to produce a conviction when one might not be obtainable on the evidence at separate trials. Clearly, joinder should never be a vehicle for bolstering either one or two weak cases against one defendant, particularly where conviction in both will give rise to a possible death sentence." (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 454.) Here, there was no significant risk of an unjustified conviction on any of the murder charges because, as discussed above, evidence in both cases was strong.

In light of the strength of the evidence in both cases, any potential to inflame the jury based on the nature of the evidence of the shootings of the police officers was not significantly likely to influence the jury's verdict in the Adkins case. Weighing against the small risk of prejudice are the substantial benefits of joinder, which include efficiencies in both the trial and appellate courts. (*Soper, supra*, 45 Cal.4th at pp. 781-782.) Defendant has failed to establish that the trial court abused its discretion in refusing to sever the Adkins case.

Defendant argues that a factor supporting the severance motion was defense counsel's indication that defendant might wish to testify in the Adkins case but not

29

in the case involving the police officers.  (See *Cross v. United States* (D.C. Cir. 1964) 335 F.2d 987, 989 [holding joinder to be prejudicial when defendant wanted to testify on one count but not, with good reason, on the other count, which involved an entirely separate incident].)  This court has recognized, however, that severance is not required on such grounds unless the defendant makes a showing that " ' "he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other." ' "  (*People v. Sandoval* (1992) 4 Cal.4th 155, 174, quoting *Baker v. United States* (D.C. Cir. 1968) 401 F.2d 958, 977.)  The showing must be specific enough to permit the court to "weigh the considerations of economy and expedient judicial administration against the defendant's interest in having a free choice with respect to testifying."  (*Sandoval*, *supra*, at p. 174.)  In *Sandoval*, we concluded that defendant's showing was insufficient because he merely made a "passing reference" to the circumstance that he wanted to testify in one case and not the other, and did not explain the nature of the testimony he wanted to give in the one case or his reasons for not wanting to testify in the other.  (*Id.* at p. 173.)  Likewise here, defense counsel merely indicated that defendant might wish to testify in the Adkins case as to self-defense or imperfect self-defense.  He made no offer of proof as to what the testimony might be or why he did not wish to testify in the other case. Consequently, the court was not afforded sufficient information to enable it to weigh the considerations favoring joinder against "the defendant's interest in having a free choice with respect to testifying."  (*Id.* at p. 174.)

Even if the trial court properly denied severance of the Adkins charge, "we look to the evidence actually introduced at trial to determine whether 'a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law.' "  (*People v. Bean*, *supra*, 46 Cal.3d at p. 940, quoting *People v. Turner* (1984) 37 Cal.3d 302, 313.)  Viewing the case as it was actually tried, we

find no such gross unfairness. The evidence in the Adkins case proved to be strong, just as the prosecution contemplated. Dickson positively identified defendant as the perpetrator and also testified as to defendant's attempts to dissuade him from testifying. The testimony in the other case was equally strong. Although the eyewitnesses who viewed the shooting of the officers had only a brief, fleeting opportunity to view the perpetrator, their testimony was bolstered by ballistics evidence tying defendant to the crime. The jury rejected the first degree murder charge as to Adkins, and convicted him of second degree murder. Thus, it is clear that the jury was able to follow the instructions to consider each offense separately and was not prejudiced by evidence of the other offenses when it considered defendant's state of mind in the Adkins case. (See CALJIC No. 17.02 ["You must decide each Count . . . separately"].)

### 2. *Admission of Autopsy Report and Coroner's Testimony Regarding Officer Kevin Burrell*

The autopsy of Kevin Burrell was performed by Dr. James Wegner, who was deceased at the time of trial. Forensic pathologist Dr. James Ribe testified at trial about the results of the autopsy. Based on Dr. Wegner's report, Dr. Ribe stated that the cause of death was multiple gunshot wounds and described the four wounds on Officer Burrell's body — to the arm, to the chin, to the left foot, and to the head. Dr. Ribe also illustrated his testimony with a display of six photographs that showed these wounds, X-rays of some of the wounds, and a mannequin into which rods had been inserted to illustrate the trajectories of the bullets.

Dr. Ribe gave his own opinions regarding the inferences that could be drawn from these wounds. He opined that the wound to the arm would have rendered the officer unable to use his right hand, because the X-ray demonstrated that the arm was shattered. The arm wound was consistent with the shooter standing in front of the officer and the officer either reaching back for a weapon or

31

buckling over. The chin wound was consistent with the officer bending forward at the waist at the time the shot was fired. The wound to the foot was consistent with the officer being on his back on the ground and lifting his foot to fend off a shot. A bullet hit the top of the officer's head, then broke into two pieces, one of which came out and one of which entered the brain. Holes in the officer's jacket, shirt, and boot were consistent with the wounds as he described them.

Defendant contends that the autopsy report and Dr. Ribe's testimony based on that report constituted testimonial hearsay, the admission of which violated his constitutional right to confront the witnesses against him. (*Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705]; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. ___ [129 S.Ct. 2527]; *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).)

Putting aside the merits, defendant's confrontation clause claim fails because even if there was error, it was harmless beyond a reasonable doubt. The fact and cause of Officer Burrell's death were sufficiently established by other evidence. Eyewitnesses described the shootings and the condition of the officer when he was found at the scene. The photographs showing the location of the wounds, the officer's boot and clothing, and the X-ray of Officer Burrell's arm showed his injuries, and this evidence clearly did not constitute testimonial hearsay. Furthermore, the cause of death was not actively contested at trial. Defense counsel, hoping to avoid exposing the jury to autopsy photographs and other evidence he considered to be inflammatory, offered to stipulate to the cause of death and the nature of the wounds. Defense counsel stated, "There is no dispute that there was an intent to kill. There is no dispute regarding the nature of the wounds." Consistent with that statement, defense counsel conducted the briefest of cross-examinations, merely clarifying that Dr. Ribe could not determine in what order the four gunshot wounds were inflicted.

The issues that were contested at trial were the identity of the killer and whether the killing was premeditated. Nothing in the autopsy report or the testimony of Dr. Ribe implicated defendant as the person who killed the two officers. The only portions of Dr. Ribe's testimony that could have contributed to a finding of premeditation were his identification of four wounds, his opinion that the shot to Officer Burrell's arm would have rendered him unable to use his right hand, and his opinion that the wound to the officer's foot could have been inflicted when he was on the ground, trying to ward off a shot. However, Dr. Ribe could have rendered these same opinions without reference to Dr. Wegner's notations in the autopsy report, because they were also based on the photographs and X-ray.

In addition, there was other evidence that overwhelmingly supported the conclusion that defendant shot Officer Burrell when the officer was on the ground and thus that the murder was premeditated. Cooksey testified that defendant admitted shooting the two officers after they were on the ground. Eyewitness Gully testified that she observed a man who looked like defendant shoot Officer Burrell while standing over him. Eyewitness Jordan also testified that she saw a man who appeared to be defendant shoot Officer Burrell in the head while he was lying facedown on the curb. Consequently, any error in the admission of the autopsy report or its contents without the opportunity for the defense to cross-examine the author was harmless beyond a reasonable doubt.

### 3. Admission of Artistic Renderings

Defendant contends the trial court erred in admitting 10 drawings of the scene of the shootings of the two police officers, which were used to illustrate the testimony of eyewitnesses Margaretta Gully, De'Moryea Polidore, and Alicia Jordan. These drawings were prepared by a police artist based on interviews with the witnesses. Each of the witnesses testified that the exhibits accurately reflected

33

what they saw, but in cross-examination, defense counsel elicited testimony demonstrating that in some respects the drawings were not accurate or that they depicted details that the witnesses did not observe. The drawings showed the shooter in a light green jacket, but both Gully and Polidore testified that he was wearing a dark jacket. Drawings used to illustrate Gully's testimony showed sparks coming out of a gun and showed the red truck with defendant's license plate number, the number "454" on the side, and the word "Chevrolet," none of which Gully observed. A drawing used to illustrate Polidore's testimony showed the number "454" on the truck, but the witness testified that he saw only "four-something-four."

Defendant argues that because the drawings demonstrated the artist's interpretation of what the scene looked like, they constituted hearsay that was inadmissible under state law. He also contends that they constituted testimonial hearsay whose admission violated the confrontation clause of the Sixth Amendment to the federal Constitution and his federal due process right to a fair trial. (See *Crawford*, *supra*, 541 U.S. 36.) To the contrary, because the drawings were admitted solely to illustrate the witnesses' testimony, and not for the truth of the matters portrayed, they did not constitute inadmissible hearsay. (See Evid. Code, § 1200 [hearsay "is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"].) Furthermore, the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford, supra,* at p. 60, fn. 9; see, e.g., *People v. McKinnon* (2011) 52 Cal.4th 610, 656 & fn. 28 [no confrontation clause violation where gang expert's testimony regarding rumors that a member of defendant's gang had been killed by a member of a rival gang was admitted for the nonhearsay purpose of explaining defendant's motive]; *People v. Mendoza* (2007) 42 Cal.4th 686, 698-

34

699 [no confrontation clause violation where murder victim's statements accusing defendant of molestation were admitted for the nonhearsay purpose of explaining defendant's state of mind]; *People v. Ledesma* (2006) 39 Cal.4th 641, 707, fn. 17 [no confrontation clause violation where identification of defendant in a photo lineup by a witness to a robbery was admitted for the nonhearsay purpose of establishing defendant's motive for killing the witness].)

Defendant contends that even if the drawings did not constitute inadmissible hearsay, they should have been excluded under state law because they did not accurately represent the scene. He also contends that their admission denied defendant a fair trial. In addition to the asserted inaccuracies noted above, defendant points out that the drawings show bright light, but the crimes occurred at night; the drawings show tinted windows in the truck, even though there was conflicting testimony on this point; and the drawings suggest that the eyewitnesses had a good opportunity to observe the perpetrator, when in fact they had only a fleeting glance of him.

In an analogous situation, we have held that in ruling on the admissibility of a videotape of the crime scene, "a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1114 (*Rodrigues*).) *Rodrigues* involved a videotape of the crime scene purporting to show the vantage point of one of the witnesses. The defendant claimed that the videotape was inaccurate in that the scenes were shot in daylight, whereas the events occurred at night; the scenes depicted one White male whereas a witness testified that she saw two males, one Hispanic and one Black; and one scene was shown from an inaccurate vantage point. (*Id*. at pp. 1113-1114.) We found no error in admitting the videotape. Once the witness confirmed in her

35

testimony that the videotape accurately showed the area where she was when she saw the assailants, the trial court could conclude that the tape was a reasonable representation of the physical layout of the building and the witness's vantage point, and that it would assist the jurors "notwithstanding the claimed inaccuracies." (*Id*. at p. 1115.) We also noted that any inaccuracies in the tapes were either obvious or brought to the jury's attention. (*Ibid*.) "Under circumstances such as these, we must assume that the jurors were intelligent people and that they understood and took into account the differences identified by defendant on appeal." (*Ibid.*; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 747 [video showing the scene of the crime was properly admitted to demonstrate the height and location of walls and fences and what could be seen over them, even though the video was taken in the daytime and the crime occurred at night].)

Likewise in the present case, the prosecution established that the drawings accurately depicted the scenes observed by the witnesses in relevant respects, and the trial court could reasonably conclude that the drawings would assist the jurors in understanding the testimony. Through cross-examination, defense counsel was able to establish that these renderings were not entirely accurate in all details, and he brought the discrepancies to the jury's attention in closing argument.[8] As in

---

[8] The most misleading inaccuracy was the inclusion of defendant's license plate number on the truck in several of the drawings, even though none of the witnesses testified that they saw the license plate number. Defendant, however, has forfeited any objection to the inclusion of the license plate number in the drawings. In ruling that the drawings were admissible, the trial court offered to have them altered to remove the license plate numbers. Defense counsel refused that offer, indicating that if the drawings were to be admitted he did not want them altered. During closing arguments, counsel exploited this inaccuracy by arguing that the inclusion of the license plate in the drawings was an example of the prosecution's "distortion of the truth."

36

*Rodrigues*, we may assume that the jurors took into account the discrepancies between the witnesses' testimony and the artists' renderings and that they were not likely to be misled.

### 4. Admission of Assertedly Prejudicial Photographs, Physical Evidence, and Testimony

Defendant contends the trial court erroneously admitted, over defense counsel's objection, allegedly inflammatory evidence to establish the circumstances of the deaths of Officers MacDonald and Burrell. According to defendant, because the circumstances of the officers' deaths were not in dispute, much of this evidence was either irrelevant or cumulative and, to the extent it had some relevance, it was more prejudicial than probative. Specifically, he argues that the evidence in question allowed the prosecutor to improperly generate sympathy for the victims and bias against defendant, making it impossible for the jury to evaluate the evidence fairly and dispassionately. Defendant claims that admission of this evidence constituted an abuse of the trial court's discretion under Evidence Code section 352 and denied him his state and federal constitutional rights to due process, a fundamentally fair trial, and a reliable adjudication of his capital case.

The physical evidence at issue includes photographs of the two officers taken during the autopsy; life-size mannequins used to illustrate the coroner's testimony regarding the location of the wounds and the trajectories of the bullets, and photographs of these mannequins; articles of clothing taken from the bodies of the officers that were stained with blood and tissue; and photographs showing the two officers when they were alive. The allegedly inflammatory testimony includes the coroner's testimony regarding the autopsy results, which was illustrated by the above mentioned photographs, mannequins, and articles of clothing; testimony by Officer Reynolds, one of the first to arrive at the scene,

37

regarding his friendship with Officer Burrell[9] and Officer Burrell's condition when he arrived;[10] testimony by Officer Metcalf regarding the condition of the two officers as they were dying; and testimony by a nurse regarding the condition of the officers as she found them at the scene, including her observation that when she felt for a pulse on one of the officers she heard a gurgling sound. The trial court did not require the prosecution to accept defendant's offer to stipulate to the testimony of the nurse and to the cause of death and the manner in which the wounds were inflicted, concluding that the prosecution was entitled to determine how it would meet its burden of proof.

Evidence Code section 352 gives the trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." A trial court's exercise of discretion under section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*People v. Williams* (2008) 43 Cal.4th 584, 634-635; *Rodrigues, supra,* 8 Cal.4th at pp. 1124-1125.)

We find no abuse of discretion in the trial court's admission of the testimony and evidence at issue. "As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence

---

[9]     The trial court overruled defendant's objection, on relevancy grounds, to the testimony regarding Officer Reynolds's relationship with Officer Burrell, noting that it could be foundational. This proved to be the case. The witness went on to describe Officer Burrell's typical practice in conducting a traffic stop of a person suspected of being armed or having engaged in a felony.

[10]     In response to defendant's objection to Officer Reynolds's description of the wounded officer, the court permitted testimony about the gunshot wounds but instructed the witness to avoid testifying about the presence of vomit and other matters that were not relevant to the issues in the case.

of the circumstances attending them even if it is grim." (*People v. Osband* (1996) 13 Cal.4th 622, 675.) Photographs and other graphic evidence are not rendered "irrelevant or inadmissible simply because they duplicate testimony, depict uncontested facts, or trigger an offer to stipulate." (*Stitely, supra,* 35 Cal.4th at p. 545.)

The trial court could reasonably conclude that the probative value of the evidence at issue was not outweighed by its potentially prejudicial effects. The testimony of the police officers and nurse who responded to the scene of the shootings had probative value in proving the circumstances of the crime. The coroner's testimony went to the cause and manner of the officers' death. The testimony regarding the condition of the officers and their wounds also was relevant to corroborate the testimony of the eyewitnesses to the shootings and as evidence that the shootings were deliberate and premeditated. To the extent some of the physical evidence and photographs that were used to illustrate the testimony may have been duplicative of testimony, it nevertheless had some value in helping the jury to understand the testimony or in corroborating the observations of witnesses.

"We have described the 'prejudice' referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*People v. Crittenden* (1994) 9 Cal.4th 83, 134.) The testimony, photographs, and physical evidence whose admission defendant challenges were "unpleasant, but not to the point of distracting the jury from its proper function." (*Stitely*, *supra*, 35 Cal.4th at p. 545.) Consequently, their admission did not violate Evidence Code section 352 or deny defendant his constitutional rights to a fair trial and a reliable death verdict. (See *People v. Kraft* (2008) 23 Cal.4th 978, 1035 ["Application of the ordinary rules of evidence

39

generally does not impermissibly infringe on a capital defendant's constitutional rights"].)

Defendant notes that the record shows that Officer MacDonald's mother was upset by the coroner's testimony and that Officer Reynolds became emotional during his own testimony. Defendant contends that the jury's observations of these reactions must have further aggravated the emotional impact of the challenged evidence, thereby overwhelming the jury's ability to respond in a reasoned manner to the evidence. That individuals who were close to the victims should become upset when hearing about, or describing, their deaths is not surprising. "As we previously have observed, victim photographs and other graphic items of evidence in murder cases always are disturbing." (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 134.) Nevertheless, absent evidence to the contrary, we may assume that the jurors were able to " 'face [their] duty calmly and undismayed.' " (*People v. Osband*, *supra*, 13 Cal.4th at p. 675, quoting *People v. Campbell* (1965) 233 Cal.App.2d 38, 43.)

### 5. *Reenactments of the Crime*

During the examinations of eyewitnesses Gully, Polidore, and Jordon, the prosecutor had each of these witnesses conduct a demonstration of what they observed, with the witness posing as the shooter and the prosecutor posing as the officers. Defense counsel objected to the prosecutor's conducting a demonstration with Gully, the first of the witnesses to testify, but the objection was overruled. Defendant contends that these demonstrations were inadmissible under Evidence Code section 352, and that they violated his federal constitutional rights to due process and a fair trial.

With witness Gully, the prosecutor portrayed Officer Burrell by lying facedown on the floor of the courtroom, in a position directed by the witness.

40

Gully then stood over him, straddling his legs in the same manner as the shooter she witnessed, holding an unloaded gun in both hands aimed at his head and from a distance of three to four feet. The prosecutor conducted a similar demonstration with Polidore, in which the prosecutor portrayed Officer MacDonald lying down and the witness portrayed the shooter, standing over him and aiming a gun toward his head. Witness Jordan was at first reluctant to perform the demonstration, but agreed to do so after she was permitted to use her finger rather than a gun. She could not recall exactly how the officer had been positioned, but demonstrated how the shooter walked around the officer and shot him.

"Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Riggs* (2008) 44 Cal.4th 248, 290.) Defendant contends that these demonstrations should have been excluded under Evidence Code section 352 because the witnesses' testimony was sufficient without resort to the demonstrations; the demonstrations distorted the facts because the witnesses had only a fleeting glimpse of the scene in poor lighting conditions; and they were inflammatory.

Reviewing the trial court's ruling for abuse of discretion (*People v. Riggs, supra*, 44 Cal.4th at p. 290), we find no such abuse. The trial court could reasonably conclude that the demonstrations would be helpful to the jury in understanding the witnesses' testimony. The demonstrations were not misleading because they did not purport to reproduce the conditions under which the witnesses viewed the scene; they purported only to show the positions of the persons observed by the witnesses. (See *Rodrigues*, *supra*, 8 Cal.4th at p. 1115 [videotape of scene purporting to show only the witness's vantage point was not inadmissible despite the fact that it did not accurately portray the lighting conditions].) Although the use of an actual gun in these demonstrations had the

potential for increasing their emotional impact, the prosecutor made clear that the gun was not loaded and the demonstrations were otherwise conducted in a manner that "did not pose an intolerable risk of negatively affecting the fairness and reliability of the proceedings." (*People v. Riggs*, *supra*, at p. 291 [trial court did not abuse its discretion in admitting a videotaped reenactment of the crime in which the depiction of the murder was brief and did not show the victim actually being shot or the aftermath of the shooting].)

### 6. Admission of Defendant's Statements Regarding the Death of Andre Chappell

Defendant contends the trial court erred in admitting "without limitation" evidence of statements he made to Bernard Dickson, a witness to the killing of Carlos Adkins. As described earlier, Dickson testified at trial that in late September 1992, while waiting to testify at a preliminary hearing in the Adkins case, he was put in the same jail cell as defendant. According to Dickson, defendant said that he would do what he could for Dickson if Dickson "looked out for him," and he offered Dickson $5,000 not to testify. They discussed that if Dickson testified, he would not be able to go back to the projects, where his daughter still lived. According to Dickson, defendant "told me I didn't want to end up like Andre [Chappell]. Andre was dead." Following this conversation, Dickson told the deputy district attorney that he was mistaken about his identification of defendant and the case was dismissed. Defendant was released and he thanked Dickson. Dickson testified that defendant never said that he was responsible for the death of Andre Chappell.

At a pretrial hearing on the admissibility of these statements, defense counsel agreed that defendant's statement regarding the death of Chappell was relevant to show Dickson's state of mind, but argued that it should be excluded under Evidence Code section 352 because the jury would inevitably speculate that

42

defendant was involved in the killing of Chappell. The trial court overruled defendant's objection, finding the evidence to be relevant to establish both Dickson's state of mind and defendant's knowledge about the homicide of Adkins.

On appeal, defendant argues that evidence of defendant's reference to Chappell should have been excluded because its probative value was outweighed by the possibility of prejudice — that is, by the possibility that the jury would conclude that defendant was responsible for the death of Chappell. A trial court's decision whether to exclude evidence under Evidence Code 352 "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice" is reviewed for abuse of discretion and will be upheld unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*People v. Williams*, *supra,* 43 Cal.4th at pp. 634-635.) The trial court did not abuse its discretion in the present case. The trial court concluded that the statement was an admission by defendant from which the jury could infer that because he knew Chappell was a witness to the Adkins shooting, he must have been present when Adkins was shot. The statement was highly relevant not only to Dickson's state of mind, but also to defendant's. The risk that the jury might have misused defendant's statement to speculate that he had killed Chappell was not so significant or so potentially prejudicial as to warrant exclusion of the evidence.

Defendant also complains that the statement was admitted "without limitation," and argues that the reference to the death of Chappell should have been admitted only for the purpose of explaining why Dickson recanted his identification of defendant. Defendant contends that the jury should not have been permitted to consider the statement as an admission because it was also likely to conclude, despite the absence of evidence, that defendant had either killed Chappell or had him killed. Defendant did not request any limiting instruction at

43

trial and he made a tactical decision to decline an instruction that would have directly addressed the risk of improper speculation. The trial court offered, and defense counsel rejected, an instruction advising the jury that there was no evidence that Chappell's death was related to the case. Such an instruction would have addressed the potential prejudice of which defendant complains — the risk that jurors would conclude that Chappell had been killed because he was a witness to the Adkins homicide. Defense counsel responded to the court's offer by expressing concern that an instruction would have highlighted the matter, stating that he would think about it. Later, during the conference on jury instructions, defense counsel brought the matter up again and stated, "*Tactically I have to decide whether or not I would request the court to . . . give an appropriate instruction or admonition or whether I just want to leave it alone.*" The court expressed its view that Dickson's testimony did not necessarily connect Chappell's death with defendant. Defense counsel ultimately chose not to accept the instruction offered by the court or to request any other form of limiting instruction. Under these circumstances, defendant has forfeited any claim that the purpose of defendant's statement should have been limited to Dickson's state of mind.

### 7. *Admission of a Stipulation about the Killing of Andre Chappell*

Defendant contends that the trial court's alleged error in admitting defendant's statements to Bernard Dickson referring to the death of Andre Chappell was compounded by an alleged additional error in admitting evidence about the circumstances of Chappell's death. At trial, the prosecutor offered to prove when, where, and how Chappell died, arguing that it was relevant to give meaning to Dickson's fear of testifying. Over defense objection, the trial court ruled that this evidence was more probative than prejudicial. In lieu of testimony,

44

however, a stipulation was read to the jury that Chappell had been shot and killed on March 20, 1992, at 9:35 p.m., in Nickerson Gardens.

Defendant argues that it was error to admit these details of Chappell's death because the reference to his death should have been admitted only to show Dickson's state of mind. Dickson had already testified that he was aware that Andre Chappell had been killed. These additional facts were not relevant, defendant argues, unless Dickson was aware of them as well. Defendant contends this information also was prejudicial because it increased the likelihood that the jury would believe that Chappell's death was connected to Adkins's murder: the shooting occurred in the same neighborhood that defendant lived in and only about one and a half months after the murder of Adkins.

We need not decide whether the trial court erred in ruling that the information contained in the stipulation regarding the killing of Chappell was admissible, because any error clearly was harmless. At the time the stipulation was read the jury already was aware that Chappell had died and that he had died shortly after the shooting of Adkins. Detective Peterson testified that Chappell did not attend the lineup that was conducted in June of 1992 because he was deceased. The only new information provided in the stipulation was the specific time of death, the location, and the fact that Chappell was shot. Given the strength of the evidence against defendant on all three murder counts, there is no reasonable possibility that these details affected the outcome of the case.

### 8. *Instruction on Reasonable Doubt*

Defendant contends the instruction on reasonable doubt, CALJIC No. 2.90 (1994 rev.) (5th ed. 1988), violates state and federal constitutional guarantees of due process and a fair trial by jury in that it (1) impliedly required the jurors to articulate a reason for their doubt; (2) admonished the jury that a possible doubt is

45

not a reasonable doubt; (3) failed to affirmatively explain that the defendant had no obligation to present or refute evidence; (4) failed to instruct that the jury's rejection or disbelief of the defendant's case does not satisfy the prosecution's burden of proof; (5) failed to instruct that a reasonable doubt could be based upon a conflict in the evidence, a lack of evidence, or a combination of the two; (6) failed to inform the jury that the presumption of innocence continues throughout the entire trial, including deliberations; and (7) described the presumption of innocence as continuing only "until" (rather than "unless") the contrary is proved. This court has consistently found no constitutional infirmity in the language of CALJIC No. 2.90 and has rejected the same contentions defendant makes here. (*People v. Taylor* (2010) 48 Cal.4th 574, 631, fn. 15.) We decline to revisit our prior conclusions in this case.

### 9. *Instructions that Assertedly Diluted the Requirement of Proof Beyond a Reasonable Doubt*

Defendant contends that a series of instructions given to the jury at the guilt phase of trial undermined and diluted the requirement of proof beyond a reasonable doubt, in violation of his state and federal constitutional rights to trial by jury, due process, and a reliable capital trial. Defendant contends the standard instructions that explained the relationship between the reasonable doubt requirement and circumstantial evidence effectively directed the jury to convict defendant based upon nothing more than a reasonable inference, thereby reversing and diluting the standard of proof and creating an impermissible mandatory presumption. (See CALJIC Nos. 2.01, 2.02, 8.83, & 8.84.1.) Defendant additionally contends that other instructions urged the jury to decide material issues by determining which side presented relatively stronger evidence, thereby implicitly replacing the "beyond a reasonable doubt" standard with a "preponderance of the evidence" standard. (CALJIC Nos. 1.00 [duties of judge

46

and jury], 2.21.1 [discrepancies in testimony], 2.21.2 [willfully false testimony], 2.22 [weighing conflicting testimony], 2.27 [sufficiency of testimony of a single witness], and 2.51 [motive].)

We have consistently rejected contentions that the instructions defendant challenges here somehow undermine the requirement of proof beyond a reasonable doubt. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 750-751 [addressing instructions on circumstantial evidence and CALJIC Nos. 2.21.2, 2.22, 2.51]; *People v. Crew* (2003) 31 Cal.4th 822, 847-848 [addressing CALJIC Nos. 1.00, 2.01, 2.02, 2.21.2, 2.22, 2.51, 8.20, 8.83, 8.83.1].) Defendant presents no persuasive reason for us to reconsider our prior conclusions regarding these instructions.

### 10. Absence of Instructions on Manslaughter

The jury was instructed on first and second degree murder, and found the defendant guilty of the second degree murder of Adkins. Defendant contends the trial court erred in refusing to give requested instructions on voluntary manslaughter and involuntary manslaughter as lesser included offenses to the charge of murder in the Adkins case. He contends the court's refusal to instruct on these offenses deprived him of his state and federal constitutional rights to present a defense, to due process and a fair trial, to have the jury determine each material issue, to require the prosecution to establish beyond a reasonable doubt every elemental fact necessary to establish the offense, to have a reliable determination of guilt and penalty, and to a properly instructed jury.

Voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [voluntary manslaughter]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145 [involuntary manslaughter].) An instruction on a lesser included offense must be given only if

47

there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense. (*People v. Breverman*, *supra*, at pp. 154, 162.) "[E]*very* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury." (*Id*. at p. 155.)

Defendant contends that the jury should have been instructed on voluntary manslaughter because it could have reasonably concluded that he went into a rage after Adkins grabbed for the gun. Voluntary manslaughter is "the unlawful killing of a human being, without malice" "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) An unlawful killing is voluntary manslaughter only "if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' [Citations.]" (*People v. Breverman*, *supra*, 19 Cal.4th at p. 163.) "The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60.)

No substantial evidence was presented that any provocation by Adkins was sufficient to cause an ordinary person of average disposition to be so inflamed as to lose reason and judgment. As explained earlier, two eyewitnesses, Bertrand Dickson and Janice Chappell, testified about the circumstances leading up to the shooting. Dickson testified that shortly before the shooting defendant apologized to Chappell for the disturbance and stated that the men in the apartment "don't know who I am." As defendant started to leave, Adkins said, "you don't know who I am either." In response, defendant came back inside, put the gun between Adkins's eyes, and threatened to shoot him. Adkins then grabbed the gun. The

two men started wrestling and two shots were fired. Even if defendant acted out of anger, Adkins's response to his threat was not sufficient to support a conviction for voluntary manslaughter. "Such predictable conduct by a resisting victim" is not the type of provocation that reduces a murder charge to voluntary manslaughter. (*People v. Jackson* (1980) 28 Cal.3d 264, 306.)

Defendant also contends that an involuntary manslaughter instruction should have been given because the jury could have concluded that the shooting occurred while defendant was engaged in the misdemeanor of brandishing a weapon and that the gun went off accidentally during the ensuing struggle. The misdemeanor of brandishing a weapon is committed when a person draws or exhibits a firearm, in the presence of another person, "in a rude, angry, or threatening manner." (§ 417, subd. (a)(2).) A killing without malice "in the commission of an unlawful act, not amounting to [a] felony" is involuntary manslaughter. (§ 192, subd. (b).) Accordingly, an accidental shooting that occurs while the defendant is brandishing a firearm in violation of section 417 could be involuntary manslaughter. (See *People v. Lee*, *supra*, 20 Cal.4th at pp. 60-61; *People v. Southack* (1952) 39 Cal.2d 578, 584.)

Nevertheless, even if we assume that the evidence was sufficient to require an instruction on involuntary manslaughter, any error in failing to give that instruction was harmless. The failure to instruct on a lesser included offense in a noncapital case[11] does not require reversal "unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*People v. Breverman, supra*, 19 Cal.4th at p. 165.) "Such posttrial review focuses

---

[11]    Because any error could have affected only defendant's conviction for the second degree murder of Adkins, this count is a noncapital matter for purposes of harmless error review.

49

not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Id*. at p. 177.)

Here, the evidence supporting the jury's verdict of second degree murder was compelling. Dickson testified that defendant put the gun between Adkins's eyes and threatened to "blow his brains out." The gun went off twice, which a jury would be unlikely to believe occurred by accident. These circumstances strongly support a conclusion that the shooting was not accidental.

Even if the jury believed that defendant did not intend to pull the trigger, the evidence strongly supported a conclusion that defendant acted with malice. As the jury was instructed, malice is implied when the killing resulted from an intentional act, the natural consequences of which are dangerous to human life, performed with knowledge of and conscious disregard for the danger to human life. (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1222; see CALJIC No. 8.11.) An unintentional shooting resulting from the brandishing of a weapon can be murder if the jury concludes that the act was dangerous to human life and the defendant acted in conscious disregard of life. (*People v. Benitez* (1992) 4 Cal.4th 91, 108-109; see also *In re Russell H.* (1987) 196 Cal.App.3d 916, 920-921 [substantial evidence supported juvenile court's finding of second degree implied malice murder where the minor pointed a loaded gun at the victim and threatened to shoot him, and the gun went off when a third party attempted to take it away].) As noted above, an eyewitness testified that defendant put the gun to Adkins's head and threatened to kill him. Such conduct is highly dangerous and exhibits a

conscious disregard for life.  In order to find defendant guilty of only involuntary manslaughter, the jury would have had to conclude *both* that the shooting was accidental and that defendant had acted without malice.  Based on the evidence presented, the jury was not reasonably likely to have convicted defendant of the lesser offense if instructions on involuntary manslaughter had been given.

> *11.  Absence of Instruction that Jury Must be Unanimous as to Degree of Homicide*

Defendant contends the trial court erred in failing to instruct the jury in a timely manner that it must agree unanimously on the degree of murder.  The prosecution initially requested that the trial court instruct the jury pursuant to CALJIC No. 8.74, which requires a unanimous verdict on the degree of murder, but the trial court did not do so.[12]  During deliberations the jury sent a note asking if it was necessary to reach a unanimous decision concerning whether the murder was in the first or second degree.  In response to the jury's question, the court reread some of the instructions already given and read CALJIC No. 8.74, which explicitly informed the jury that if it found defendant guilty of murder, "you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree."  After the jury returned its verdicts, defense counsel moved for a mistrial, noting that the verdict forms finding defendant guilty of the first degree murders of the two police officers had been signed before the court

---

[12]    The trial court declined to give the prosecution's proposed instruction on the ground that it referred to manslaughter.  The version of CALJIC No. 8.74 submitted by the prosecution read as follows:  "Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also, if you should find [him] guilty of an unlawful killing, you must agree unanimously as to whether [he][she] is guilty of [murder of the first degree] [or] [murder of the second degree] [or] [voluntary] [or] [involuntary] manslaughter]."

51

instructed the jury with CALJIC No. 8.74. The trial court denied the motion, concluding that the jury had been properly instructed and that CALJIC No. 8.74 was merely a clarification.

We agree with the trial court that the instructions given initially properly informed the jury that it could not return a verdict finding defendant guilty of murder in the first degree unless it so found unanimously. The jury was instructed to state in the verdict "whether you find the murder to be of the first or second degree." (CALJIC No. 8.70.) It was further instructed that "all twelve jurors must agree to the decision and to any finding you have been instructed to include in your verdict." (See *People v. Kozel* (1982) 133 Cal.App.3d 507, 528-529 [failure to give CALJIC No. 8.74 was not error, when other instructions and verdict forms adequately informed jury of requirement of unanimity].)

Furthermore, contrary to defendant's contention, the fact that the jury inquired about the unanimity requirement after it had returned verdicts finding defendant guilty of the first degree murders of Officers Burrell and MacDonald does not establish a reasonable possibility that defendant was prejudiced by the trial court's failure to read CALJIC No. 8.74 earlier. The most likely inference that may be drawn from the circumstances is that the question simply did not arise in connection with the murders of the police officers because all jurors agreed that those murders were of the first degree. The evidence that defendant shot both officers after they were down overwhelming supported a conclusion that these murders were premeditated. In addition, after the verdicts were read — and *after* the court had read CALJIC No. 8.74 in response to the jury's question — the jury was polled and each juror agreed that the verdicts read were his or her own, thereby confirming that the verdicts were unanimous. Consequently, the failure to read CALJIC No. 8.74 earlier could not have affected the jury's verdict.

52

*12. Constitutionality of Reference to the Prosecution as "the People"*

Defendant contends that references during his trial to the prosecution as "the People" or as representing "the People" — including comments by the court and the prosecutor, references in the jury instructions, and the identification of exhibits as "People's Exhibits" — rendered his trial fundamentally unfair, in violation of the due process clauses of the state and federal Constitutions. Because defendant never objected at trial to references to the identification of the prosecution as "the People," he has forfeited the claim on appeal. In any event, reference to the prosecution as "the People" does not violate due process. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 223; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1068; *People v. Black* (2003) 114 Cal.App.4th 830, 832-834.)

*13. Constitutionality of Peace Officer Special Circumstance*

The special circumstance of killing a peace officer applies to a first degree murder if "[t]he victim was a peace officer, as defined in [enumerated Penal Code sections] who, while engaged in the course of the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a peace officer engaged in the course of the performance of his or her duties . . . ." (§ 190.2, subd. (a)(7).) Defendant contends that this special circumstance is unconstitutionally vague and overbroad on a number of grounds.

First, defendant argues, the special circumstance requires only that a defendant should have known the victim was a peace officer, rather than that he actually knew. We have previously rejected the claim that the "reasonably should have known" element renders the peace officer special circumstance unconstitutional. (See *People v. Daniels* (1991) 52 Cal.3d 815, 874; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224; *People v. Brown* (1988) 46 Cal.3d 432,

53

444; *People v. Rodriguez* (1986) 42 Cal.3d 730, 780-783.)  Defendant provides no persuasive reason for us to reconsider these decisions.

Second, he contends the special circumstance is vague because "peace officer" has been defined broadly to include many categories of individuals whose status as a peace officer would not be apparent to the ordinary person.  (See, e.g., §§ 830.6 [persons summoned to the aid of peace officers], 830.35 [child support investigators], 830.37 [volunteer fire wardens].)  Nevertheless, the "reasonably should have known" element would prevent a true finding on the special circumstance if the victim's status would not have been apparent to a reasonable person.

Third, defendant argues that because the special circumstance includes individuals who are not traditionally involved in law enforcement, including, for example, an investigator for the Public Employees' Retirement System, lottery security personnel, or an investigator at a race track (§ 830.3), it fails to meaningfully distinguish between those killings in which the imposition of a death sentence is justified as compared to killings in which it is not, as required by *Zant v. Stephens* (1983) 462 U.S. 862.  This contention does not provide a basis for challenging the special circumstance or death sentence in defendant's case, however, because the victims were traditional law enforcement officers whose status as such was apparent — they were in uniform and driving a marked police car at the time of the incident.

Finally, defendant contends this court's decisions interpreting the special circumstance to apply so long as the officer's conduct was objectively lawful and regardless of the *defendant's subjective belief* that the officer's conduct is unlawful have rendered the special circumstance unconstitutionally overbroad. (See *Gonzalez*, *supra*, 51 Cal.3d at pp. 1217-1218; *People v. Jenkins* (2000) 22 Cal.4th 900, 1020-1021 (*Jenkins*).)  We explained in *People v. Rodriguez, supra*,

42 Cal.3d 740, that making eligible for the death penalty a defendant who "should have known" the victim was a police officer is constitutional because it reasonably serves the goals of retribution and deterrence. (*Id*. at p. 781.) Applying the special circumstance to situations in which the officer was lawfully engaged in his or her duties, even if the defendant believed otherwise, is constitutional for the same reasons. As we have observed, limiting the special circumstance to situations in which the defendant subjectively believed that the officer was acting lawfully "would be inconsistent with the purpose of the special circumstance to afford special protection to officers who risk their lives to protect the community, and obviously would undermine the deterrent effect of the special circumstance." (*Jenkins, supra,* at p. 1021.)

### 14. *Constitutionality of Multiple-Murder Special Circumstance*

Defendant contends that the multiple-murder special circumstance is overbroad, in violation of the Eighth Amendment to the federal Constitution, because it applies to persons and crimes of many different levels of culpability and thus presents no rational means of distinguishing those cases in which the death penalty is appropriate from those in which it is not. He acknowledges that we have previously rejected this claim (see, e.g., *People v. Sapp* (2003) 31 Cal.4th 240, 286; *People v. Boyette* (2002) 29 Cal.4th 381, 440), but presents no persuasive reason for us to reconsider this conclusion.

### 15. *Jury's Discussion of the Murder of a Witness's Wife*

Defendant contends that his convictions should be reversed because jurors committed prejudicial misconduct in reading or listening to news reports about the death of a witness's wife and discussing the topic during deliberations. Witness Mark Buster had testified that he sold a red 1992 Chevrolet 454 pickup truck to defendant. During guilt phase deliberations, a juror revealed to the court that a

55

discussion had occurred among the jurors about the death of Buster's wife, who had been shot shortly before Buster's testimony. Defendant moved for a mistrial. After questioning each juror about this subject, the court denied defendant's motion, concluding that although "technically" there had been a violation of the admonition not to read or listen to news reports about the case or to consider information that was not presented in court, the matter had not entered into the jury's deliberations. The court then informed the jury that "the death of Mark Buster's wife has nothing to do with this case and is unrelated to this case; that is, it is not to enter into your deliberations or decision-making in any way, any form, or fashion."

"Although inadvertent exposure to out-of-court information is not blameworthy conduct, as might be suggested by the term 'misconduct,' it nevertheless gives rise to a presumption of prejudice, because it poses the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut." (*People v. Nesler* (1997) 16 Cal.4th 561, 579.) This "presumption of prejudice may be rebutted . . . by a reviewing court's determination, *upon examining the entire record*, that there is no substantial likelihood that the complaining party suffered actual harm." (*People v. Hardy* (1992) 2 Cal.4th 86, 174, italics added.)

Respondent contends that no presumption of prejudice arises in the present case because the information did not concern a party to the case or events involved in the case. We need not decide whether respondent's argument is correct because, in any event, we find no substantial likelihood that any juror was biased by the information regarding the death of Buster's wife. When juror misconduct involves the receipt of information from extraneous sources, a substantial likelihood of juror bias "can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely

56

to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.]" (*In re Carpenter* (1995) 9 Cal.4th 634, 653.) In reviewing the trial court's ruling regarding a claim of juror misconduct, we accept the trial court's findings of historical fact if supported by substantial evidence, but we review independently the question of whether prejudice arose from juror misconduct. (*Id.* at pp. 646, 658-659.) "In an extraneous-information case, the 'entire record' logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant." (*Id.* at p. 654.)

The record here establishes no reasonable likelihood that any juror was influenced by the information that Buster's wife had been killed because it is not the type of information that was inherently likely to influence the jurors. Buster's testimony involved only defendant's purchase of his truck, which was not a matter that was actively contested in the case. Furthermore, no juror reported any speculation that Buster's wife was targeted because of her husband's testimony, or that defendant — who was in custody at the time of her death — was involved. The trial court noted that Buster had demonstrated a good relationship with defendant in front of the jury, by shaking his hand and speaking to him. According to the jurors, who were questioned by the court, the subject of the killing came up when the jurors discussed Buster's testimony and they talked about it for about five minutes, but they recognized that it was not relevant and moved on to other matters. Finally, the trial court clearly instructed the jury that

57

the death of Buster's wife had nothing to do with the case and that it should not enter into the jury's deliberations.[13]

### C. Penalty Phase Issues

#### 1. Admission of Weapons Convictions

Defendant contends the trial court erred in admitting, as evidence in aggravation, defendant's two felony convictions for being a convicted felon in possession of a firearm (§ 12021, subd. (a)) and being in possession of a concealed weapon (§§ 12021, subd. (a) & 12025, subd. (a)(5)). These convictions resulted from his guilty plea to charges that were part of the present case. Defendant is correct that prior felony convictions are not admissible under section 190.3, factor (c), unless the conviction preceded the commission of the capital crime. (*People v. Carter* (2005) 36 Cal.4th 1215, 1271; *People v. Bradford* (1997) 15 Cal.4th 1229, 1373-1374; *People v. Balderas* (1985) 41 Cal.3d 144, 201-202.)

Defendant further argues that these convictions were not admissible under section 190.3, factor (b), as evidence of criminal activity involving the "express or implied threat to use force or violence." (See *People v. Cox* (2003) 30 Cal.4th

---

**13** Defendant states that one of the jurors believed that this evidence "should have been presented" during the trial, which defendant argues means that the juror "believed that [defendant] was responsible for the killing." The record does not support this contention. Defendant appears to rely on a statement by one juror, who told the court that several people talked about the incident "and I just felt that that should have been of some concern because it was some fact — it was some fact that was stated, and it wasn't presented to us." This juror was the first to mention to the court that the jury had discussed the death of Buster's wife. The juror had explained that "I felt that it could have been some type of misconduct because that was some evidence that was not presented to us and it was stated in the jury room." Considered in this context, it seems clear that the juror was not expressing the view that evidence about this incident should have been presented to them, but that the jurors should not have been discussing it because it had not been.

916, 973 [mere possession of guns does not constitute a crime of violence]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1235 ["firearm possession is not, in every circumstance, an act committed with actual or implied force or violence"]; but see *People v. Quartermain* (1997) 16 Cal.4th 600, 631 ["Possession of sawed-off firearms and silencer materials carries an implied threat of violence because their obvious purpose is to harm humans"].)

Respondent argues that the weapons convictions were properly considered by the jury under section 190.3, factor (a), as "circumstances of the crime of which the defendant was convicted in the present proceeding." "[W]e have assumed that factor (a), though it speaks in the singular of the 'crime' of which defendant was currently convicted, covers the 'circumstances' of *all* offenses, singular or plural, that were adjudicated in the capital proceeding." (*People v. Montiel* (1993) 5 Cal.4th 877, 939, fn. 33; accord, *People v. Rogers* (2006) 39 Cal.4th 826, 909; *People v. Sanchez* (1995) 12 Cal.4th 1, 70.) Defendant contends, however, that factor (a) includes only the circumstances of any crimes for which the death penalty is contemplated, and that crimes that are entirely unrelated to the capital offense do not become admissible at the penalty phase merely because they were charged in the same proceeding as the capital crimes.

We need not resolve whether the jury should have been allowed to consider this evidence because, in any event, there is "no reasonable possibility that" evidence of these two convictions "affected the penalty verdict." (*People v. Howard* (2010) 51 Cal.4th 15, 38.) The evidence was cumulative of other evidence establishing that defendant had possessed firearms on several occasions. Each of the victims was shot with a handgun. At the guilt phase, defendant's wife testified that she had seen defendant with a gun and that he had given her a gun. Evidence was presented at the penalty phase that defendant once threw a gun as

59

police officers chased him. The penalty verdict would not have been different if evidence of these two convictions had been excluded.

### 2. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed three instances of misconduct at the penalty phase, denying him a fair trial and violating his Eighth and Fourteenth Amendment rights under the federal Constitution to a reliable capital sentence. "In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury." (*People v. Price*, *supra*, 1 Cal.4th at p. 447; see *People v. Hill* (1998) 17 Cal.4th 800, 819.) "When, as here, the point focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Berryman*, *supra*, 6 Cal.4th at p. 1072.) We conclude that none of the prosecutor's actions constituted misconduct.

Defendant's first complaint concerns the prosecutor's argument that if defendant were sentenced to life imprisonment he could be a danger to other inmates. The prosecutor stated, "If he engages in some type of acts of violence on another inmate without parole, what could be done to him? It would be a freebie." When trial counsel objected to the latter remark, the trial court told the jury to disregard it. Defendant contends this remark was designed to appeal to the jury's passions and prejudices and that, in any event, future dangerousness is not a proper aggravating factor under California law.

To the contrary, "prosecutorial argument regarding defendant's future dangerousness is permissible when based on evidence of the defendant's conduct rather than expert opinion." (*People v. Ervin* (2000) 22 Cal.4th 48, 99 [prosecutor's argument, based on the defendant's record, that he would present a

60

discipline problem in prison because he would have "nothing to lose," was not improper].) " 'It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567.) The evidence of defendant's crimes presented at the guilt phase and the other incidents of violent criminal conduct properly presented at the penalty phase provided a sufficient basis for the prosecutor's argument. (See *People v. Taylor* (1990) 52 Cal.3d 719, 750 [argument that defendant would present a danger in prison was proper based on "defendant's record of violence outside the prison walls"].) Furthermore, the trial court instructed the jurors to disregard the prosecutor's comment that any future act of violence "would be a freebie." "We can only assume they followed the instruction, and did not allow this isolated remark to affect the verdict." (*Stitely*, *supra,* 35 Cal.4th at p. 571.)

Defendant further complains that during the cross-examination of defendant's wife, Deshaunna Cody Thomas, the prosecutor asked whether she intended to have conjugal relations with defendant while he was imprisoned. Defense counsel's objection to this question was sustained. Defendant contends that this question constituted misconduct because it solicited clearly irrelevant information and insinuated that defendant would be able to have sexual relations with his wife if he were given a life sentence. Although the subject matter of conjugal relations is not necessarily irrelevant in an appropriate case (see, e.g., *People v. Arias* (1996) 13 Cal.4th 92, 178), there was no evidence in the present case that such visits could occur. To the extent the prosecutor's question insinuated such visits could occur when there was no evidence on that point, defendant failed to request an admonition, which could have cured any potential

61

harm. (See *Stitely*, *supra*, 35 Cal.4th at p. 568 [defendant forfeited claim of prosecutorial misconduct by failing to request a curative admonition].)

Defendant contends, finally, that the prosecutor committed misconduct in questioning certain witnesses about how defendant obtained money and in referring to defendant's purchase of a truck for $18,000 shortly before the shooting of the police officers.[14] Defendant argues the prosecutor was improperly attempting to suggest to the jury that defendant was involved in some kind of illegal activity such as drug dealing, thereby impermissibly introducing facts not in evidence and causing the jury to consider a nonstatutory aggravating factor.

Putting aside the merits of defendant's claim, any misconduct was clearly harmless. If the prosecutor was attempting to elicit information from defense witnesses that defendant was engaged in illegal money-making activities, he was not successful. The prosecutor asked several of defendant's friends and relatives if they knew how he obtained money. None of them were aware of how defendant earned money, other than his occasional work as a security guard at a liquor store.[15] To the extent the prosecutor's questions may have insinuated that he was

_____

[14] There was testimony at the guilt phase that defendant had paid $18,000 for the truck.

[15] During the cross-examination of defendant's wife, the prosecutor asked her how defendant earned his money. She testified that defendant did not have a job but that she did not know where his money came from. When the prosecutor asked her whether defendant had a bank account, the defense objected to the line of questioning. The prosecutor argued that he was attempting to impeach the witness's testimony that he was a good father and husband, on the theory that having a bank account and providing for the family were consistent with being a good father and husband. The court sustained the objection.

The prosecutor pursued a similar line of questions with other witnesses. He asked Kawasci Jackson whether defendant paid child support for their son. She stated that he did not, but that he had given her a total of about $80 when she asked for it. She did not know whether defendant was working at the time. Kim

*(footnote continued on next page)*

62

aware of illegal money-making activities by defendant, the jury was admonished not to "assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it helps you to understand the answer." (CALJIC No. 1.02.) Furthermore, the prosecutor made no suggestion during his closing argument that defendant was engaged in illegal money-making activities. He stated that defendant gave money to his family only when asked, "Yet he can afford a truck the cost of which is $18,000." The prosecutor argued that defendant's actions — including fathering several children with women other than his wife, staying away from home one or two nights a week, dropping out of school, not working, and spending money on a truck while contributing very little to his children — were not consistent with being a good husband and father. These arguments were a fair comment on the evidence and contained no suggestion that the prosecutor was aware or believed that defendant was selling drugs or engaged in other illegal activity. Under these circumstances, defendant was not prejudiced by the prosecutor's line of questioning regarding defendant's income.

*(footnote continued from previous page)*

Graham, a neighbor, also did not know whether defendant was working, and did not know where he obtained the money to buy the red truck. Defendant's mother, Iris Thomas, testified in response to the prosecutor's questions that her son had worked at a liquor store. When the prosecutor asked whether she knew that defendant had paid $18,000 for a truck, the trial court interrupted, asked the prosecutor to approach the bench, and admonished him, "You have been trying to get out that he has been selling drugs, and you tried. $18,000 has got nothing to do with this case." After defendant's aunt, Sheila Griggs, had testified about the times defendant had helped relatives and neighbors financially, the prosecutor asked her if she knew where his money came from. She did not know how he earned money, other than by working as a security guard in a store. The prosecutor elicited from defendant's cousin, Patricia Mosley, the fact that the last time she saw him, he had a red truck but he was not employed.

63

### 3. Admission of Photographs of Victims and Their Families

Defendant contends the trial court erred in permitting the prosecutor, over defense objection, to illustrate the testimony of penalty phase witnesses with photographs of the victims and their family members. Before trial, the prosecutor sought to introduce photographs of Officer Burrell in his uniform; Burrell with his arm around his mother; Burrell's infant son, Kevin, Jr.; Officer MacDonald with his brother when they were children; MacDonald with his brother at a wedding; and MacDonald's graduation from the police academy. The court excluded the picture of MacDonald and his brother and the one of MacDonald at his brother's wedding, but allowed the prosecutor to use the rest. During his penalty phase argument, the prosecutor referred to the photographs and asked the jurors to look at the photographs of the officers with their families and to compare those to the autopsy photographs.[16]

Defendant contends the admitted photographs are not the type of victim impact evidence that is permissible at the penalty phase because they provided no new information beyond the testimony that was given by family members and

---

[16] "If any of you are considering or pondering to give this defendant a life without parole sentence, before you do that, before you do that, take a look at the photographs of Officer MacDonald. . . . Look at the happy faces of John and his brother . . . and the happy face of Jimmy and his parents when he graduated at the police academy. [¶] And then look at the coroner photographs. Look at that dead face and those bullet wounds that were caused by him, this defendant and nobody else. And take a look at this. This is the exhibit of Officer [Burrell] . . . there with his family smiling during the marriage of his older brother, there with his mom with his arm around her, and his dad there at the birthday party, and there he is feeding his baby son a bottle. [¶] And that is his son later on, the son that will never know a father. Look at these photos, ladies and gentlemen, and then look at the coroner photographs, the bullet hole in the face, through the bottom of the foot, through the top of the head, through the arm. None of this would have happened if this defendant didn't make the decision to murder these young men."

their sole purpose was to inflame the passions of the jurors. Defendant also asserts that the photographs were "unduly prejudicial and likely to provoke irrational, capricious, or purely subjective responses from the jury." We have rejected such arguments in previous cases, upholding the admission of similar types of photographs when used to illustrate victim impact testimony. (See *People v. Davis* (2009) 46 Cal.4th 539, 618 [photograph of victim's mother and sister taken shortly after the victim was kidnapped]; *Stitely*, *supra*, 35 Cal.4th at p. 565 [photograph of victim with her husband]; *People v. Boyette, supra,* 29 Cal.4th at p. 444 [photographs of victims]; *People v. Edwards* (1991) 54 Cal.3d 787, 836 [photographs of victims at the time of the crimes].) The photographs admitted here, and the prosecutor's use of them in argument, assisted the jury in evaluating the consequences of defendant's crimes and they were not the type of "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response." (*People v. Haskett* (1982) 30 Cal.3d 841, 864, quoted in *People v. Edwards*, *supra*, at p. 836.)

### 4. *Absence of Cautionary Instruction on Victim Impact Evidence*

Defendant contends the trial court erred in refusing to read to the jury a special cautionary instruction offered by defense counsel regarding victim impact evidence.[17] We have previously rejected claims that an identical instruction

---

**17** The proposed instruction provided: "Evidence has been introduced for the purpose of showing the specific harm caused by the defendant's crime. Such evidence was not received and may not be considered by you to divert your attention away from your proper role of deciding whether the defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction of death as the result of an irrational, purely subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy."

should have been given, finding it to be duplicative and potentially confusing and misleading. We concluded in *People v. Ochoa* (2001) 26 Cal.4th 398, 455, that "[t]he proposed instruction would not have provided the jury with any information it had not otherwise learned from CALJIC No. 8.84.1 . . . ." In *People v. Harris* (2005) 37 Cal.4th 310, 359, we noted that the instruction proffered by defendant is confusing because it is "unclear as to whose emotional reaction it directed the jurors to consider with caution — that of the victim's family or the jurors' own." Furthermore, we concluded that the instructions read to the jury, including the standard penalty phase instruction, CALJIC No. 8.85, which was also provided in the present case, "did not give the jurors the mistaken impression that they could consider emotion over reason, nor did the instructions improperly suggest what weight the jurors should give to any mitigating or aggravating factor." (*People v. Harris*, *supra*, at p. 359; see also *People v. Carey* (2007) 41 Cal.4th 109, 134.) In *People v. Zamudio* (2008) 43 Cal.4th 327, 368, we stated that an instruction similar to the one proposed here "is misleading to the extent it indicates that emotions may play no part in a juror's decision to opt for the death penalty" because in considering victim impact evidence the jury may exercise sympathy for the murder victims and their family members.

Defendant also argues that if the proposed instruction was imperfect, the trial court should have altered it. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 924 [concluding "the trial court erred in failing to tailor defendant's proposed instruction [regarding evidence of other sex offenses] to give the jury some guidance regarding the use of the other crimes evidence, rather than denying the instruction outright"]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1110 [to the extent the defendant's proffered instruction regarding eyewitness identification was argumentative, the trial court should have tailored it rather than denying it outright]; *People v. Hall* (1980) 28 Cal.3d 143, 159 [trial court should have

tailored instruction regarding reasonable doubt and eyewitness identification rather than refusing it].) Because we have concluded that the gist of the proposed instruction was adequately covered by the standard instructions that were given (see, e.g., *People v. Ochoa*, *supra*, 26 Cal.4th at p. 455), even a modified version of defendant's instruction would have been duplicative and unnecessary.

### 5. *Refusal to Instruct on Lingering Doubt*

Defendant contends the trial court erred in denying defendant's request that the jury be instructed that a "lingering or residual doubt [about guilt], although not sufficient to raise a reasonable doubt at the guilt phase, may still be considered as a mitigating factor at the penalty phase." There was no error. Such an instruction is not required by the federal Constitution. (*Franklin v. Lynaugh* (1988) 487 U.S. 164, 174.) "[W]e repeatedly have held that although it is proper for the jury to consider lingering doubt, there is no requirement that the court specifically instruct the jury that it may do so. [Citations.]" (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1219.)

Defendant contends that even if an instruction on lingering doubt is not generally required, it was required in this case. He cites our statement in *People v. Cox* (1991) 53 Cal.3d 618, that a trial court "may be required to give a properly formulated lingering doubt instruction when warranted by the evidence." (*Id*. at p. 678, fn. 20.) We have since concluded, however, that such an instruction is unnecessary when the jury is properly instructed — as was defendant's jury — regarding the aggravating and mitigating factors described in Penal Code section 190.3, factors (a) (circumstances of the crime) and (k) (other circumstances that extenuate the gravity of the crime). (*People v. Ward* (2005) 36 Cal.4th 186, 219-220; *People v. Hines* (1997) 15 Cal.4th 997, 1068.)

67

## 6. Refusal to Define Life Without Possibility of Parole

Defendant contends the trial court erred in refusing to instruct the jury that life without parole means "exactly what it says. The defendant will be imprisoned for the rest of his life" and "the death penalty means exactly what it says: That the defendant will be executed." We have consistently held that such an instruction need not be given because it is incorrect to tell the jurors that the penalty they select "will inexorably be carried out." (*People v. Thompson* (1988) 45 Cal.3d 86, 130; cf. *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 204-206 [suggesting that an appropriate instruction would admonish the jury not to be influenced by speculation on whether the chosen penalty will come about].)

## 7. Refusal of Instructions Regarding Mercy

Defendant contends the trial court erred in refusing to instruct the jury that it could be influenced by mercy. Defendant offered five different instructions that included the topic of mercy, all of which the trial court refused.[18]

Defendant acknowledges that this court has consistently rejected similar claims of instructional error because we have concluded that the standard CALJIC

---

[18]     The proposed instructions included defendant's requested instructions No. 2 ("Contrary to the law in the guilt phase, in this part of the trial the law permits you to be influenced by mercy, sympathy, compassion or pity for the defendant or his family . . . ."), No. 8 ("A mitigating circumstance is a fact about the offense or about the defendant which in fairness, sympathy or compassion, or mercy, may be considered in extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death"), No. 11 ("A juror is permitted to use mercy, sympathy and/or sentiment in deciding what weight to give each mitigating factor"), No. 12 ("If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty"), and No. 19 ("If a mitigating circumstance . . . arouses mercy, sympathy, empathy, or compassion . . . you may act in response thereto and impose a sentence of life without the possibility of parole").

instructions on section 190.3, factor (k) leave adequate room for the consideration of mercy. (See *People v. Griffin* (2004) 33 Cal.4th 536, 591.) Defendant's jury was likewise instructed that it could consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial" and that it was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." (See CALJIC Nos. 8.85 and 8.88.) These instructions allowed the jury to exercise mercy based upon any of the factors presented, and defense counsel argued that the law permitted the jury to exercise mercy. ("You can exercise mercy. The law allows you to do that.") Although defendant asserts that an instruction on mercy should have been given to inform the jury that it could exercise mercy based upon how an execution would affect defendant's family members, sympathy for a defendant's family is not itself a mitigating factor. (*People v. Smithey* (1999) 20 Cal.4th 936, 1000.) Refusal was appropriate.

> 8. *Refusal to Instruct that Facts Supporting the Murder Verdict are not Aggravating Factors*

Defendant asserts the trial court erred in refusing a proposed instruction that would have informed the jury that "[i]n deciding whether you should sentence the defendant to life imprisonment without the possibility of parole, or to death, you cannot consider as an aggravating factor any fact which was used by you in finding him guilty of murder in the first degree unless that fact establishes something in addition to an element of the crime of murder in the first degree. The fact that you have found Mr. Thomas guilty beyond a reasonable doubt of murder in the first degree is not itself an aggravating circumstance." (Defendant's requested instruction No. 6.)

69

The trial court did not err.  In *People v. Moon, supra,* 37 Cal.4th 1, the trial court refused an instruction containing language identical to the first sentence in defendant's proposed instruction.  We rejected the same arguments defendant makes in the present case, concluding that the proposed instruction is an incorrect statement of the law.  (*Id.* at p. 41.)  Furthermore, in *People v. Earp* (1999) 20 Cal.4th 826, at pages 900-901, we concluded that similar instructions were duplicative of CALJIC No. 8.88, which tells the jury that "[a]n aggravating factor is any fact, condition or event attending the commission of a crime which increases its severity or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself."  CALJIC No. 8.88 was given in defendant's case.

### 9.  Refusal of Other Proposed Penalty Phase Instructions

Defendant argues the trial court erred in refusing to give several other instructions requested by the defense that were offered to address particular aspects of defendant's theory of the case in mitigation.  We find no error.

The court did not err in declining defendant's proposed instructions informing the jury that any mitigating factor, standing alone, may be the basis for a decision that death is not the appropriate punishment.  (Defendant's requested instructions Nos. 7, 20.)  (See *People v. Berryman, supra,* 6 Cal.4th 1048, 1099-1100 [instruction that one mitigating circumstance may justify a life sentence would have been proper, but was not required]; *People v. Breaux* (1991) 1 Cal.4th 281, 317.)  Nor did the court err in refusing instructions elaborating on the scope of mitigation.  An instruction that specifically identifies defense evidence that the

70

jury may consider in mitigation is not required.[19]  (See *People v. Gutierrez, supra,* 28 Cal.4th at p. 1159 [defendant not entitled to instruction listing the evidence he viewed as mitigating].)  The remainder of the proposed instructions,[20] which defendant contends would have clarified the scope of mitigation, were duplicative of CALJIC Nos. 8.85 and 8.88, which were given.  The standard instructions are "sufficient to advise the jury of the full range of mitigating evidence, and nothing more is required."  (*People v. Edwards, supra,* 54 Cal.3d at pp. 841-842.)  Finally, the proposed instruction directing the jury not to consider the deterrent effect or cost of the death penalty (defendant's requested instruction No. 14) was properly

_____

[19]     Defendant's requested instruction No. 4A would have informed the jury that it could consider, among other factors:  "The effect of the defendant's upbringing, childhood and family life," "The effect of parental narcotic addiction," "The effect of having no biological father ever present in the home," and "The relationship between the defendant and his mother, siblings, children, wife, relatives and significant others."

[20]     These included defendant's requested instructions No. 7 ("You may also consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty"), No. 8 ("A mitigating circumstance is a fact about the offense or about the defendant which, in fairness, sympathy, compassion, or mercy, may be considered in extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense"), No. 9 ("Mitigating factors are unlimited and anything mitigating should be considered and may be taken into account in deciding to impose a sentence of life without possibility of parole"), No. 10 ("Any aspect of the offense or the defendant's character or background that you consider mitigating can be the basis for rejecting the death penalty"), No. 11 ("A juror should not limit his or her consideration of mitigating circumstances to these specific factors"), No. 12 ("If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty"), and No. 24 ("The evidence presented regarding the defendant's background may only be considered by you as mitigating evidence").

refused because neither party raised those issues. (See *People v. Brown* (2003) 31 Cal.4th 518, 566.)

### 10. Rereading of Guilt Phase Instructions and Rejecting Proposed Defense Instruction on Jury's Normative Role

At trial, defense counsel objected to the rereading at the penalty phase of a number of guilt phase instructions that focused on the jury's factfinding role.[21] Defense counsel proposed that the court read an instruction focused on the jury's normative role in deciding the appropriate sentence: "Your duty in this phase of the case is different from your duty in the first part of the trial where you were required to determine facts and apply the law. Your responsibility in the penalty phase is not merely to find facts, but also — and most important — to render an individualized, moral determination about the penalty appropriate for the particular defendant — that is whether he should live or die." Defendant contends that the trial court erred in rereading the guilt phase instructions without also providing the jury with his proposed instruction. He asserts that as a result, the jury lacked a proper sense of its obligation to exercise a moral judgment and the death sentence was imposed in violation of numerous state and federal constitutional guarantees — including his rights to present a defense, to a fair and

---

[21] The guilt phase instructions included CALJIC Nos. 1.02 (statements of counsel), 1.03 (juror forbidden to make any independent investigation), 2.00 (direct and circumstantial evidence), 2.11 (production of all available evidence not required), 2.21.1 (discrepancies in testimony), 2.21.2 (witness willfully false), 2.22 (weighing conflicting testimony), 2.27 (sufficiency of testimony of one witness), 2.60 (defendant not testifying), and 2.90 (presumption of innocence, reasonable doubt, burden of proof).

reliable capital trial, and to the presumption of innocence, and in violation of the requirement of proof beyond a reasonable doubt.[22]

We have encouraged the rereading of guilt phase instructions regarding the consideration of evidence at the penalty phase. (*People v. Carter* (2003) 30 Cal.4th 1166, 1222.) Such instructions can assist the jury in evaluating the evidence presented. Nevertheless, defendant is correct that the jury's role in a capital penalty trial is not limited to finding facts and applying the law to those facts. The jury "decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death." (*People v. Haskett, supra,* 30 Cal.3d at p. 863.)

The trial court did not err in rereading the guilt phase instructions or in refusing to deliver defendant's proffered instruction, however, because the instructions that were given adequately explained the jurors' role. The jurors were told to "consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict." (CALJIC No. 8.84.1.)[23] After the court delivered instructions regarding the consideration and evaluation of evidence, the court read the list of aggravating and mitigating factors that the jury was to "take into account and be guided by." Finally, the court instructed the jury in the language of CALJIC No. 8.88: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of

---

[22]    Defendant also argues that the prejudicial effect of this error was compounded by the other instructional errors discussed above, including the omission of defendant's proposed instructions and on the scope of mitigating evidence. Because we have found no error, there is no compounding prejudice.

[23]    By contrast, the instruction given at the guilt phase of trial told the jurors to "conscientiously consider and weigh the evidence, apply the law, and reach a just verdict regardless of the consequences." (CALJIC No. 1.00.)

parole, shall be imposed on the defendant.  After having heard all the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. . . .  The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them.  You are free to assign whatever moral or sympathetic value you deem appropriate to each and all the various factors you are permitted to consider.  In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

Such instructions are sufficient to convey to the jury its responsibility in deciding the appropriate punishment.  (See *People v. Ochoa, supra,* 26 Cal.4th at pp. 456-457 [trial court did not err in refusing a proposed instruction regarding the jury's moral responsibility to determine the appropriate penalty because it was duplicative of CALJIC No. 8.88].)  Contrary to defendant's assertion, these instructions were not undermined by other instructions that provided guidance to the jury in determining the facts upon which its moral judgment was to be exercised.

### 11. *Refusal to Inform the Jury That Failure to Reach a Penalty Verdict Would not Require a Retrial of the Guilt Phase*

During his closing argument at the penalty phase, the prosecutor told the jurors that if they could not reach a unanimous verdict, "[a] mistrial will be declared on the penalty portion and the entire thing has to be done all over again."

74

The trial court interrupted the prosecutor's argument and admonished the jury to "completely disregard" the comment about what would happen if there were a mistrial. "That is not a factor in your decision making, all right, as if you didn't hear it. Disregard it." At that time, defense counsel did not ask for additional instructions or admonitions. After four days of jury deliberations, however, defense counsel requested that the court instruct the jury that if it was unable to reach a verdict, only the penalty phase would have to be retried. The trial court refused the request.

Defendant contends the trial court erred and that the prosecutor's comment created a substantial risk that the jury would return a death verdict because it feared that a hung jury would reverse its guilt phase verdicts, possibly causing defendant to go free. We disagree. Even assuming defendant is correct that the jury likely interpreted the prosecutor's reference to "the entire thing" as meaning that the entire trial, rather than just "the penalty portion," would have to be retried, the trial court had already admonished the jury to disregard the prosecutor's comment. We presume the jury followed the court's instruction. (*Stitely*, *supra*, 35 Cal.4th at p. 570.) Additional instructions clarifying the prosecutor's comment would have implicitly conflicted with the trial court's admonition that the jury disregard that comment.

### 12. *Instruction with Unmodified CALJIC No. 8.85*

Defendant contends the trial court erred in rejecting proposed modifications to CALJIC No. 8.85, the standard instruction that lists the statutory aggravating and mitigating factors that the jury must consider at the penalty phase, and that the instructions given were constitutionally flawed. He complains that certain instructions proposed by defense counsel but rejected by the trial court could have cured these constitutional defects. (Defendant's requested instructions Nos. 4, 5,

15, 16, 17, 18, and 24.) We have previously rejected similar contentions that the standard CALJIC instructions are constitutionally defective, and we do so again here. (See, e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 191-192.)

As to the modified instruction proffered by defendant, we have specifically concluded the jury need not be instructed that evidence presented regarding defendant's background may be considered only in mitigation (*People v. Rogers, supra,* 39 Cal.4th at p. 897); that certain factors may be considered aggravating, others may be mitigating, and others could be either (*People v. Brown* (2004) 33 Cal.4th 382, 402; *People v. Catlin* (2001) 26 Cal.4th 81, 178; see *Tuilaepa v. California* (1994) 512 U.S. 967, 979); that the absence of a mitigating factor is not an aggravating factor (*People v. Pollock* (2004) 32 Cal.4th 1153, 1193-1194); or that no additional factors, other than those on which the jury has been instructed, may be used in aggravation (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180; see *People v. Espinoza* (1992) 3 Cal.4th 806, 827 ["Such an instruction is appropriate only when extraneous aggravating evidence not falling within any of the statutory factors has been presented to the jury"]).

Defendant also requested that arguably inapplicable mitigating factors be deleted from the list. (Defendant's requested instruction No. 4A.) Such deletions are not required. (*People v. Young* (2005) 34 Cal.4th 1149, 1226; *People v. Ghent* (1987) 43 Cal.3d 739, 776-777.) He contends that section 190.3, factor (i), age, as interpreted by this court to include "any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty" (*People v. Lucky* (1988) 45 Cal.3d 259, 302), is unconstitutionally vague. We have held to the contrary. (*Jenkins, supra,* 22 Cal.4th at pp. 1051-1052; see *Tuilaepa v. California, supra*, 512 U.S. at p. 977.)

Defendant acknowledges that this court previously has rejected contentions identical to the ones he raises here, but argues that we have not adequately

76

addressed his reasoning.  We disagree.  Defendant presents no new arguments sufficient to cause us to reconsider our prior conclusion that CALJIC No. 8.85 is "not unconstitutionally vague and does not allow the penalty process to proceed arbitrarily or capriciously."  (*People v. Farnam, supra*, 28 Cal.4th at p. 192; accord, *People v. Jennings* (2010) 50 Cal.4th 616, 690.)

### 13.  Instruction with CALJIC No 8.87

Defendant contends the trial court erred in instructing the jury pursuant to CALJIC No. 8.87, which states that a juror must be satisfied beyond a reasonable doubt that alleged prior violent criminal activity occurred before considering it as a factor in aggravation.  As modified to apply to the criminal activity alleged in defendant's case, the instruction included the following language:  "Evidence has been introduced for the purpose of showing that the defendant . . . has committed the following *criminal act*, battery on a peace officer, which involved the *express or implied use of force or violence*.  Before a juror may consider any of *such criminal act* as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant . . . did, in fact, commit such criminal act. . . .  It is not necessary for all jurors to agree.  If any juror is convinced beyond a reasonable doubt that *such criminal activity* occurred, that juror may consider that activity as a factor in aggravation."  (Italics added.)

Defendant contends that three aspects of this instruction skewed the jury's deliberations in the prosecution's favor and violated his state and federal constitutional rights to a fair trial and a reliable penalty verdict.  First, he complains that the instruction identified his act as a criminal one involving violence, thereby leaving the jury to decide only whether the alleged act occurred, and removing the questions of whether that act violated a criminal statute and involved force or violence.  We have previously held that the question of whether

the acts occurred is a factual issue for the jury, but "the *characterization* of those acts as involving an express or implied use of force or violence, or the threat thereof, would be a legal matter properly decided by the court." (*People v. Nakahara* (2003) 30 Cal.4th 705, 720.)

Second, defendant argues that in defining the acts as involving "the express or implied *use* of force or violence" (italics added), the instruction misinformed the jury of the scope of the statute, which also includes an implied *threat* of force or violence. (§ 190.3, factor (b).) He contends this instruction deprived the jury of the opportunity to consider whether defendant's act involved only an implied threat of force or violence, which is a type of conduct that could be considered less aggravating than an *actual* threat or use of force or violence. The alleged criminal activity in the present case — battery — involved actual violence. Consequently, the absence of a reference to implied threats of violence could not possibly have been misleading.

Finally, defendant contends that it was unfair to instruct the jury that it need not be unanimous in deciding whether violent criminal conduct had been proved, because the court had refused to instruct the jury that it need not be unanimous in deciding whether mitigating factors had been proved. We have previously rejected this contention and find no basis on which to reconsider our prior conclusion. (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

### 14. *Instruction With Unmodified CALJIC No. 8.88*

Defendant contends the trial court erred in instructing the jury pursuant to CALJIC No. 8.88, regarding the weighing of aggravating and mitigating factors at the penalty phase, and rejecting the modifications proposed by defense counsel. He asserts that CALJIC No. 8.88 as given at defendant's trial was constitutionally defective in that it was vague and imprecise, failed accurately to describe the

78

weighing process, and deprived defendant of the individualized consideration the Eighth Amendment requires. He also contends the instruction was improperly weighted toward death because, by telling the jury it could impose a death sentence if the "aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole," the instruction permitted the jury to impose a death sentence merely because the aggravating circumstances were "substantial," even if they did not outweigh the mitigating circumstances. Defendant argues that his proposed modifications, would have corrected some of these defects. (Defendant's requested instructions Nos. 1, 11, 13, 21, 22, 25, 26, 27, 30, 31, 33.) We have previously concluded that CALJIC No. 8.88 is not unconstitutionally defective. (See, e.g., *People v. Taylor*, *supra*, 26 Cal.4th at p. 1181; *People v. Jackson, supra,* 13 Cal.4th at p. 1243.) Defendant recognizes that we have rejected similar arguments in the past, and provides us with no persuasive reason to reconsider those decisions.

### 15. *Constitutional Challenges to California's Death Penalty Statute*

Defendant contends that numerous features of California's death penalty law, alone or in combination with each other, violate the federal Constitution because the category of offenders who are eligible for the death penalty is impermissibly broad and because there are insufficient safeguards in the penalty phase process to ensure a reliable outcome. As defendant acknowledges, we have previously rejected each of the specific contentions that he presents here:

The special circumstances set out in section 190.2 adequately narrow the class of offenders eligible for the death penalty. (*People v. Morrison* (2004) 34 Cal.4th 698, 730.)

Section 190.3, factor (a), which permits the "circumstances of the crime" to be considered as an aggravating factor, is not so vague or broad (as evidenced by

79

how it has been used in practice to include a broad range of circumstances) as to result in unconstitutionally arbitrary and capricious imposition of the death sentence. (*People v. Brown, supra,* 33 Cal.4th at p. 401.) Nor does it violate defendant's rights to due process and equal protection by permitting the jury to consider the same facts in aggravation multiple times. (*People v. Millwee* (1998) 18 Cal.4th 96, 164.)

The California death penalty scheme is not constitutionally defective because it fails to require jury unanimity on the existence of aggravating factors, or because it fails to require proof beyond a reasonable doubt that death is the appropriate penalty, that aggravating factors exist, or that aggravating factors outweigh mitigating factors. (*People v. Lynch* (2010) 50 Cal.4th 693, 766.) The United States Supreme Court's decisions interpreting the right to a jury trial under the federal Constitution (see *Blakely v. Washington* (2004) 542 U.S. 961; *Ring v. Arizona* (2002) 536 U.S. 584) do not change these conclusions. (*People v. Thomas* (2011) 51 Cal.4th 449, 506.)

No burden of proof is constitutionally required, and the jury need not be instructed that there is no burden of proof. (*People v. Taylor* (2009) 47 Cal.4th 850, 899.)

The jury need not make written findings. (*Jenkins, supra,* 22 Cal.4th at p. 1053.)

Intercase proportionality review is not required. (*People v. Crittenden, supra,* 9 Cal.4th at pp. 156-157.)

The use of unadjudicated criminal activity at the penalty phase and the absence of a requirement that the jury agree unanimously that it has been proved do not render a death sentence unreliable. (*People v. Anderson* (2001) 25 Cal.4th 543, 584.)

Section 190.3, factor (b), which permits the jury to consider a defendant's other violent criminal activity, is not unconstitutionally vague. (*People v. Anderson, supra,* 25 Cal.4th at p. 601.)

The use in aggravation of prior felony convictions under section 190.3, factor (b), but not subsequent felony convictions under section 190.3, factor (c), is not arbitrary or capricious. (See *People v. Gurule* (2002) 28 Cal.4th 557, 636 [the purpose of factor (c) is to show that the defendant was undeterred by previous criminal sanctions].)

The use of the same jury for the guilt and penalty phases does not deprive defendant of an impartial and unbiased jury. (*People v. Roger*s, *supra,* 39 Cal.4th at p. 894.)

The list of mitigating factors in section 190.3 does not unconstitutionally limit the jury's consideration of relevant mitigating evidence. (*People v. Harris, supra,* 37 Cal.4th at p. 365; *People v. Brown, supra,* 33 Cal.4th at p. 402.)

The capital sentencing scheme does not violate equal protection by denying to capital defendants procedural safeguards that are available to noncapital defendants. (*People v. Rogers*, *supra*, 39 Cal.4th at p. 893; *People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

A presumption that the sentence should be life imprisonment without the possibility of parole is not constitutionally required. (*People v. Gamache* (2010) 48 Cal.4th 347, 407; *People v. Arias, supra,* 13 Cal.4th at p. 190.)

### 16.  *International Law*

We have previously rejected the contentions that the California death penalty violates international law, evolving international norms of decency, or the International Covenant on Civil and Political Rights. (*People v. Jennings, supra,* 50 Cal.4th at p. 690; *People v. Brown, supra,* 33 Cal.4th at pp. 403-404.)

## 17. *Cumulative Prejudicial Effect of Errors*

Defendant contends that the cumulative prejudicial effect of the alleged errors discussed above requires reversal. We have found no error, and have assumed error only as to four of defendant's contentions: (1) that the testimony of Dr. Ribe and the admission of an autopsy report regarding the autopsy of Officer Burrell violated defendant's right to confront the witnesses against him; (2) that the trial court erred in failing to instruct on the lesser included offense of involuntary manslaughter of Carlos Adkins; (3) that the trial court erred in permitting the jury to consider defendant's convictions for being a convicted felon in possession of a weapon and possession of a concealed weapon; and (4) that the prosecutor committed misconduct in questioning witnesses about defendant's sources of income. Because the first of these contentions affected only the charge of the murder of Officer Burrell, and the second affected only the charge of the murder of Carlos Adkins there could not have been any cumulative prejudicial effect. Although both the third and fourth assumed errors involved the penalty phase, even when they are considered together we find no reasonable possibility that they affected the verdict.

## 18. *Sentence for the Second Degree Murder*

Although defendant does not raise the issue, the trial court made an error in sentencing that should be corrected. The trial court imposed a sentence of death for counts 1, 2, and 3. On count 1, the murder of Carlos Adkins, defendant was convicted only of second degree murder, an offense that is not punishable by death. (§ 190, subd. (a).) The jury's verdict reflects that the jury fixed the sentence at death only on counts 2 and 3, the murders of Officers Burrell and MacDonald. Under our authority to modify an unauthorized sentence (§ 1260), we direct the trial court to issue an amended abstract of judgment reflecting the appropriate sentence for second degree murder, which is imprisonment for

82

15 years to life (§ 190, subd. (a)).  (See *People v. Lawley* (2002) 27 Cal.4th 102, 172.)

### III.  DISPOSITION

The judgment is modified as follows:  the sentence of death imposed on count 1 for second degree murder is vacated, and the trial court is directed to send an amended abstract of judgment to the Department of Corrections and Rehabilitation reflecting a sentence of imprisonment for 15 years to life on that count.  As so modified, the judgment is affirmed.


CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Thomas
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S048337
**Date Filed:** February 23, 2012
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Edward A. Ferns


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Mary K. McComb, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Peggy Bradford Tarwater and Douglas Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mary K. McComb
Deputy State Public Defender
801 K Street, Suite 1100
Sacramento, CA  95814
(916) 322-2676

Douglas Wilson
Deputy Attorney General
300 South Spring Street
Los Angeles, CA  90013
(213) 620-6097